UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

**AVERY MCKNIGHT, JR.,**

Plaintiff,

v.                                                    CASE NO.:   3:15-cv-159-BJD-JRK

**JEREMY P. GARRIOTT,** in his
individual capacity, **STEPHEN P.
VOTAVA,** in his individual capacity,
**JAMES P. MORGAN,** in his individual
capacity, **ALVARO DIAZ, as CHIEF of
the DIVISION OF HEALTH SERVICES,**
in his official and individual capacity,
**SCHOLASTICA OKAFOR,** in her
individual capacity, and **MELISSA
PETERSON,** in her individual capacity,

Defendant(s).

_____/

## PLAINTIFF'S THIRD AMENDED COMPLAINT

COMES NOW, the Plaintiff, AVERY MCKNIGHT, JR. ("Mr. McKnight"), by and

through his undersigned counsel, and brings this action for violation of his civil rights against the

Defendants, **JEREMY P. GARRIOTT,** in his individual capacity ("Officer Garriott"),

**STEPHEN P. VOTAVA,** in his individual capacity ("Officer Votava"), **JAMES P. MORGAN,**

in his individual capacity ("Officer Morgan"), **ALVARO DIAZ, as CHIEF of the DIVISION**

**OF HEALTH SERVICES,** in his official and individual capacity ("Chief Diaz"),

**SCHOLASTICA OKAFOR,** in her individual capacity ("Nurse Okafor"), and **MELISSA**

**PETERSON,** in her individual capacity ("CMA Peterson"), and alleges:

1.     This is a civil rights action brought by Mr. McKnight pursuant to 42 U.S.C. § 1983, seeking damages for the Defendants' (Officers Garriott, Votava, and Morgan) use of excessive force in violation of the Fourth Amendment to the United States Constitution.

2.     Mr. McKnight, pursuant to 42 U.S.C. § 1983, brings this civil rights action seeking damages for the Defendants' (Officers Garriott and Votava) deliberate indifference to his serious medical needs in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

3.     Mr. McKnight, pursuant to 42 U.S.C. § 1983, brings this civil rights action seeking damages for the Defendants' (Officers Garriott, Votava, and Morgan) deliberate indifference to his serious mental health needs in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

4.     Additionally, Mr. McKnight, pursuant to 42 U.S.C. § 1983, brings this civil rights action seeking damages for the Defendants' (Chief Diaz, Nurse Okafor, and CMA Peterson) deliberate indifference to his serious medical needs in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

## JURISDICTION

5.     This action for damages is brought to redress the deprivation of Mr. McKnight's civil rights secured by the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution and pursuant to 42 U.S.C. § 1983.

6.     This Honorable Court has jurisdiction pursuant to 28. U.S.C. § 1331 because this is a civil action arising under the Constitution of the United States.

7. This Honorable Court has jurisdiction pursuant to 28 U.S.C. § 1343(a)(3) because this action seeks to redress the deprivation, under color of state law, of rights secured to Mr. McKnight by the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

8. This Honorable Court has jurisdiction pursuant to 28 U.S.C. § 1343(a)(4) because this action seeks to recover damages, or any other relief as this Honorable Court may deem just and proper, under any Act of Congress providing for the protection of civil rights.

9. Mr. McKnight grounds his claim for attorneys' fees, costs, and expert fees in 42 U.S.C. § 1988 which authorizes the award of attorneys' fees and costs to the prevailing plaintiff in an action or proceeding to enforce the provisions of 42 U.S.C. § 1983.

10. Mr. McKnight was arrested on July 31, 2014, in Duval County, Jacksonville, Florida. Despite observing bizarre behavior from Mr. McKnight that was to be considered a medical emergency under established protocol, Officers Garriott, Votava, and Morgan failed to document this behavior and failed to call for medical assistance. Rather, *after* being handcuffed, secured, and placed in the backseat of a police car, Mr. McKnight was physically assaulted, beaten, and battered by Officers Garriott and Votava, while Officer Morgan watched and did not intervene. Officers Garriott and Votava then left Mr. McKnight handcuffed and hogtied on the ground, concussed and bleeding from his face, for over an hour.

11. Subsequent to his beating on July 31, 2014, Mr. McKnight was incarcerated or otherwise confined in jail or other correctional facility until his conditional release on or about February 13, 2017. Due to the fact that Mr. McKnight's cause of action against Defendants Chief Diaz, Nurse Okafor, and CMA Peterson materialized during his incarceration and due to the fact that Mr. McKnight was incarcerated at the time he filed the instant action, the provisions of the

Prison Litigation Reform Act ("PLRA") of 1995, 42. U.S.C. § 1997e, apply to his cause of action for deliberate indifference to his serious medical needs. Mr. McKnight has fully exhausted his administrative remedies.

**VENUE**

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because all of the events and omissions giving rise to Mr. McKnight's claims occurred in this District.

**PARTIES**

13.     Mr. McKnight is an African-American citizen of the United States of America. Mr. McKnight was diagnosed with schizophrenia and persistent depressive disorder and was found not guilty by reason of insanity for charges stemming from his arrest by Officers Garriott, Votava, and Morgan on July 31, 2014. The events giving rise to Mr. McKnight's Fourth, Eighth, and Fourteenth Amendment claims for excessive force and deliberate indifference to his serious medical and mental health needs occurred while he was in the custody of Officers Garriott, Votava, and Morgan during the night of July 31, 2014, and early morning hours of August 1, 2014. Mr. McKnight was incarcerated at the Duval County Pre-Trial Detention Facility awaiting trial when the events giving rise to his Eighth and Fourteenth Amendment claim for deliberate indifference to his serious medical needs occurred.

14.     Defendant Chief Diaz was the former Chief of the Division of Health Services, a division of the Jacksonville Sheriff's Office Department of Corrections at all times material to this action. In this position, Chief Diaz excised control over, and had a duty to supervise the provision of medical care to inmates and, specifically, for coordinating additional medical care

outside of the Department of Corrections when inmates are in need of specialized medical care. Chief Diaz is sued in his official capacity and individual capacity.

15.    Defendant Officer Garriott was a police officer employed by the Jacksonville Sheriff's Office at all times material to this action. He is sued in his individual capacity.

16.    Defendant Officer Votava was a police officer employed by the Jacksonville Sheriff's Office at all times material to this action. He is sued in his individual capacity.

17.    Defendant Officer Morgan was a police sergeant employed by the Jacksonville Sheriff's Office at all times material to this action. He is sued in his individual capacity.

18.    Defendant Nurse Okafor was a licensed practical nurse. Upon information and belief, she was employed by the Jacksonville Sheriff's Office, Department of Corrections. She is sued in her individual capacity.

19.    Defendant CMA Peterson was a certified medical assistant. Upon information and belief, she was employed by the Jacksonville Sheriff's Office, Department of Corrections. She is sued in her individual capacity.

20.    At all times material to the events described herein, the individual Defendants were acting under the color of state law.

### FACTUAL ALLEGATIONS

21.    On the night of July 31, 2014, Mr. McKnight arrived at the FBI Field Office located at 6061 Gate Parkway North, Jacksonville, Florida 32256 ("FBI"). Mr. McKnight went to the FBI because he believed that somebody was following him and trying to kill him. He thought that the FBI would be able to protect him. Upon approaching the gate, Mr. McKnight

made contact with the security officer on duty, Mr. Frederick Henshaw ("Mr. Henshaw"). Mr. McKnight had a pistol on his person that evening; he produced the weapon in a non-threatening manner so Mr. Henshaw knew he had a weapon on him. Mr. McKnight took self-defense and gun safety courses where instructors taught students that when coming into contact with law enforcement, you should inform law enforcement that you are armed so as avoid surprise. When Mr. Henshaw told Mr. McKnight to leave, Mr. McKnight resorted to climbing over the gate at the FBI. Mr. Henshaw drew his service pistol and demanded Mr. McKnight to drop his pistol. Mr. McKnight complied with the demands, dropped his pistol, and finished climbing over the fence into the FBI's parking lot.

22. Mr. McKnight was detained and handcuffed (in the front of his body) by Mr. Henshaw. This initial contact with Mr. Henshaw was without incident. There was no struggle or use of force and Mr. McKnight was detained peacefully. Surveillance footage obtained from the FBI by Mr. McKnight confirms that there was no struggle between Mr. Henshaw and Mr. McKnight.

23. Officers Garriott, Votava, and Morgan (collectively, "Officers"), of the Jacksonville Sheriff's Office ("JSO"), all responded to the scene in their own squad cars. Mr. McKnight was turned over to the Officers and was re-cuffed with his hands behind his back. Mr. McKnight was escorted from the security building and placed into the rear driver's side seat of Officer Garriott's squad car. Surveillance footage obtained from the FBI by Mr. McKnight confirms that Mr. McKnight's hands were cuffed behind his back as he left the security building. The surveillance footage also shows that Mr. McKnight had no visible injuries to his face as he

was escorted out of the security building. The surveillance footage also shows Mr. McKnight being placed into the back seat of Officer Garriott's squad car.

24.     For nearly an hour, Mr. McKnight was left alone and handcuffed in the back of the squad car while the Officers completed their investigation at the FBI. Importantly, Mr. McKnight was sitting in the squad car without incident during this whole time.

25.     Shortly before they left the FBI, the Officers returned to the squad car where Mr. McKnight was being held. Without reason, justification, provocation, or necessity, Mr. McKnight was violently pulled out of the back seat of the squad car by the collar of his shirt by Officer Votava. Mr. McKnight, still handcuffed behind his back and therefore defenseless, was thrown on the ground by Officer Votava. Mr. McKnight's head hit the ground causing severe pain, dizziness, and loss of vision. While on the ground, Officers Garriott and Votava, acting in concert with each other, beat, punched, kicked, kneed, and otherwise assaulted and battered a defenseless Mr. McKnight, causing severe physical injuries to his head and body, including bleeding, bruising, and scarring. During this violent assault, Mr. McKnight pleaded to the Officers to stop and, when his pleas went ignored, Mr. McKnight resorted to screaming "help me" as loud as he could. Officer Votava positioned his knee on Mr. McKnight's temple and began to bang his head on the concrete. Officer Votava or Officer Garriott took his flashlight or some other cylinder-like object and tried to force it into Mr. McKnight's mouth in an effort to muffle or silence his pleas. Officer Votava then used his knee and body weight to rub and grind Mr. McKnight's head against the concrete, causing Mr. McKnight's skin to peel from his face. Years later, the left-side of Mr. McKnight's face is noticeably lighter in color than the right-side of his face as a result of permanent scarring due to Officer Votava's conduct.

26.     Officer Morgan stood nearby and watched as Officers Garriott and Votava viciously assaulted and battered Mr. McKnight. Officer Morgan did not intervene or attempt to stop the beating. Rather, Officer Morgan allowed this violent and unjustified conduct to continue.

27.     The sadistic assault on Mr. McKnight lasted for several minutes. Surveillance footage obtained from the FBI by Mr. McKnight shows that a period of approximately five (5) minutes lapsed between the time a defenseless Mr. McKnight was violently ripped out of the back seat of the squad car and Mr. McKnight being picked up and put back in the squad car by Officers Votava, Garriott, and Morgan. Following this brutal beating, Mr. McKnight was placed in a Total Appendage Restraint ("TAR") (a device used to bind a person's legs together and connect the legs to the handcuffs behind the person's back; essentially a "hogtie" for a human being). The result of the TAR, also known as a "hobble," being applied was that Mr. McKnight's legs were strained backwards in an "L" shape, connecting to the handcuffs behind his back. He was then thrown into the back seat of the squad car without being secured by a seat belt. Surveillance footage obtained from the FBI by Mr. McKnight then shows the Officers get into their respective squad cars and leave the FBI.

28.     JSO's Response to Resistance ("RTR") states that it is the policy of JSO "to allow officers to use only the degree of force which is reasonable and necessary to effect an arrest or to protect themselves or others from personal attack, physical resistance, harm, or death." Further, the RTR provides that officers will be "required" to obtain medical evaluations as soon as practical for an individual who shows signs of "any injury" as a result of force being applied and

for an individual who complains of any injury as a result of force being applied. See Sections I.B. and I.G., General Order LXII.5(72), Response to Resistance, attached hereto as "Exhibit A."

29.     During the approximate 12-mile drive from the FBI to the John E. Goode Pre-Trial Detention Facility, located at 500 East Adams Street, Jacksonville, Florida 32202 ("PDF"), a facility operated by JSO, a beaten, hogtied, defenseless Mr. McKnight was thrown about the back of the squad car as Officer Garriott drove erratically. Mr. McKnight's head slammed into the door and the back of the front seat. Mr. McKnight repeatedly requested that he be taken to the hospital as he was in severe pain. However, Officer Garriott continued to drive erratically, causing further injury to Mr. McKnight.

30.     Importantly, when he was escorted out of the FBI by the Officers, Mr. McKnight was handcuffed behind his back and had no visible injuries to his face. By the time he was booked at the PDF, a mere hours after the Officers took custody of him, Mr. McKnight's booking photos clearly show a battered, bleeding, bruised, and swollen Mr. McKnight.

31.     Once at the PDF, Officers Votava and Garriott removed Mr. McKnight from the police car and placed him on his stomach on the ground. Mr. McKnight still had the TAR applied to him so he couldn't move and could hardly breathe. Mr. McKnight remained in the TAR, face-down on the ground for over an hour. Officers Votava and Garriott mocked, threatened, and intimidated Mr. McKnight while he lay defenseless, battered, and bloody. Despite their actions that evening, at no point did Officers Votava or Garriott seek medical treatment for Mr. McKnight.

32.     In addition to physical injuries, the RTR provides:

Officers may receive information about another person or observe behavior indicating the person is not in touch with reality (bizarre behavior/mental confusion) . . . and/or sudden obvious changes in their mental or physical

> **condition. If this occurs, officers shall notify the Communications Center using the 10-69 radio signal and attempt to contain this individual until additional police and Fire Rescue personnel are available. These types of observed behaviors may be indicators of a serious medical condition and should be handled as a <u>medical emergency</u>.**

See Section I.D., Exhibit A (bold and underlined emphasis added).

33.     Officers Votava, Garriott, and Morgan all knew that Mr. McKnight was suffering from some form of mental illness and that he was not in touch with reality during the events giving rise to this lawsuit. JSO conducted an Internal Affairs ("IA") Investigation into the actions by the Defendant-Officers. The Defendant-Officers all testified, under oath, that Mr. McKnight was acting "schizophrenic," like someone suffering from a "psychotic break" or a "mental illness," and that he was not in touch with reality. Interestingly, these statements and the bizarre behavior witnessed by the Defendant-Officers supporting these statements were not included in the Arrest Report. See Arrest and Booking Report, attached hereto as "Exhibit B." Furthermore, this bizarre behavior was not reported by Officers Votava or Garriott to the medical staff at the PDF.

34.     IA found, based on the recorded statements of Votava, Garriott, Morgan, other witnesses, and Mr. McKnight himself, that Mr. McKnight's behavior during the night of this incident fit into this "bizarre behavior" category. Defendants Votava and Garriott completed a 40-hour training entitled "A Focus on Mental Illness" in 2009 and a 30-minute "retraining" entitled "Mental Illness Response" in 2011. Defendant Votava completed a 30-minute "policy review" entitled "Excited Delirium" in August, 2011, and a 16-hour training entitled "Excited Delirium" in March, 2009. Defendant Garriott completed a 16-hour training entitled "Excited Delirium" in January, 2009. Defendant Morgan completed a 30-minute "policy review" entitled

"Excited Delirium" in August, 2011, and a 30-minute "Mental Illness Response" "retraining" in April, 2011. The Defendant-Officers' under-oath statements that they observed Mr. McKnight exhibiting bizarre behavior akin to someone with a mental illness coupled with their training on mental illness indicate that the Defendant-Officers clearly knew Mr. McKnight was suffering from a mental illness and did nothing about it. The Defendant-Officers were required to seek medical assistance under the RTR policy and failed to do so. The Defendant-Officers then failed to even document any of the bizarre behavior they admittedly witnessed in the Arrest and Booking Report. See Exhibit B ("Does the arrestee have an observed medical/mental health problems?" - *No*). This information is contained under the "triage" section of the Arrest and Booking Report, a part of the report which would be used by the medical staff at the PDF in order to take a quick glance at whether an arrestee has any immediate medical or mental health issues that need to be addressed.

35. IA further found that Officers Votava and Garriott "had no reasonable explanation as to why they did not see the injury which was clearly visible to the medical staff and documented thirty-eight (38) minutes after McKnight was accepted into the PDF." Both Officers Votava and Garriott were familiar with their duty to fill out an RTR form if an arrestee suffered an injury. Despite having a physical altercation with Mr. McKnight wherein a TAR was applied to bind his legs and hands together, all of which resulted in serious and obvious injuries to him, Officers Votava and Garriott did not fill out an RTR form, presumably in an attempt to conceal the fact that Mr. McKnight was injured while in their custody. Interestingly, when posed a specific question on the Arrest and Booking Report, the Defendant-Officers failed to properly document the fact that Mr. McKnight was placed in a TAR. See Exhibit B ("Was a hobble

restraint used on the arrestee?" - *No*). Again, had this important information been accurately listed in the "triage" section of the Arrest and Booking Report, Mr. McKnight likely would have received proper medical attention immediately upon entering the PDF. IA concluded with a recommendation that Officers Votava and Garriott be charged with failure to conform to work standards for failing to fill out an RTR form.

36.     Upon being booked at the PDF, Mr. McKnight received a medical screening from Nurse Okafor. Mr. McKnight told Nurse Okafor about his visibly-clear injuries, how they occurred, and how much pain he was in. Nurse Okafor ignored Mr. McKnight's pleas and requests. Prior to any kind of medical examination, Nurse Okafor stated that Mr. McKnight was not going to be transported to the hospital. Importantly, Nurse Okafor ignored established policies and procedures promulgated by the Jacksonville Sheriff's Office, Division of Health Services, which state that "[p]ersons who are unconscious, semiconscious, <u>bleeding, mentally unstable, or otherwise urgently in need of medical attention are immediately referred for care to Shands Jacksonville</u>." *See* Office of the Sheriff, Consolidated City of Jacksonville, Unit Procedure – DHS 2.3.2.02 ("Unit Procedure"), attached hereto as "Exhibit C" (emphasis added). The Unit Procedure states that its purpose is to "ensure that inmates receive appropriate health screening services to identify any health needs upon arrival at JSO Department of Correction facilities." *See* Exhibit C. Mr. McKnight was clearly bleeding from both sides of his face, his wrists, and his shoulder, and was complaining of severe head, torso, and back pain due to the beating. Mr. McKnight asked Nurse Okafor if she or any other medical personnel would be applying sutures to his wounds or taking x-rays of his torso, back, and head. Nurse Okafor responded "no." Mr. McKnight received an ice pack for his swollen face but no medicine or

other treatment. Nurse Okafor failed to document any of these injuries or how these injuries occurred and failed to follow protocol by not admitting Mr. McKnight to Shands Jacksonville. Nurse Okafor cleared Mr. McKnight to continue with the booking admissions process, despite his obvious injuries.

37.     Mr. McKnight next met with CMA Peterson as part of the booking process. CMA Peterson was responsible for giving Mr. McKnight a further medical screening to determine whether he was medically clear to be admitted into the PDF. According to established policies and procedures promulgated by the Jacksonville Sheriff's Office, Department of Corrections, CMA Peterson was required to make a visual assessment of Mr. McKnight's physical condition to ensure he was not in need of immediate medical attention. See Office of the Sheriff, Consolidated City of Jacksonville, Florida, Department of Corrections, Operational Order 3.3.6 ("Operational Order"), attached hereto as "Exhibit D." She was further required to review the Arrest and Booking Report to determine if Mr. McKnight had been involved in a "physical altercation or other incident in which an injury may result." See Exhibit D. While Mr. McKnight denies the accuracy of the report, his Arrest and Booking Report clearly states that there was an "incident," that he was "subdued on the ground," and that a "TAR was applied to the defendant's feet . . . ." See Exhibit B. CMA Peterson was required to get approval from the medical screening nurse and the on duty processing lieutenant prior to accepting an arrestee who appears seriously injured, has been hobbled or has been in a TAR, or claims severe/urgent medical problems. See Exhibit D. CMA Peterson noted that Mr. McKnight had a "large abrasion" that was "significant" and further noted that Mr. McKnight was involved in a "physical altercation during his arrest." See Screening Form, attached hereto as "Exhibit E." Despite the fact that Mr.

McKnight's face was bloody and swollen and that he was pleading for medical assistance due to the severe pain, and despite the fact that he had been placed in a TAR, CMA Peterson medically cleared him without tending to his wounds and without getting proper clearance from the on duty processing lieutenant. Furthermore, CMA Peterson assigned Mr. McKnight a top bunk and stated that he didn't need any assistance with activities of daily living. See Exhibit E. Mr. McKnight had difficulty getting into his bunk, dressing, and bathing due to his injuries.

38.      After having been denied any medical care, treatment, or medicine during any stage of the medical screening process, Mr. McKnight filled out a health services request form on Friday, August 1, 2014. See Non-Emergency Health Request form dated August 1, 2014, attached hereto as "Exhibit F." Mr. McKnight notated that he had pain in his "face," "hands," and "back," and that the pain was "aching," "burning," and "crampy." See Exhibit F. Mr. McKnight notated a 10 on a scale of 1 to 10, with 10 being the "worst pain of your life." See Exhibit F. Further, he stated that the pain is "often" and that he had "30" episodes of this pain in the last 24 hours. See Exhibit F. At this point, Mr. McKnight's pain was so severe that his vision was blurry, he was nauseous, and his left eye was swollen shut due to the swelling in the left side of his face. Mr. McKnight's August 1, 2014, request was not actually processed until the following Monday, August 4, 2014. See Exhibit F. Mr. McKnight endured bouts of the worst pain in his life over the weekend without any medical attention, treatment, or medication.

39.      On August 5, 2014, Mr. McKnight met with Nurse Valerie Thompson and Nurse Brenda Davies. Mr. McKnight detailed the incident involving the Officers and described his level of pain. Despite having the worst pain of his life, Mr. McKnight was given a single dose of

Tylenol and some ointment for his wounds. See Nursing Protocol, attached hereto as "Exhibit G."

40.     On August 11, 2014, having not received any adequate medical care for his injuries and pain sustained from his July 31 beating, Mr. McKnight requested a grievance form. See Non-Emergency Health Services Request form dated August 11, 2014, attached hereto as "Exhibit H." This request was processed on August 13, 2014, and Mr. McKnight received a grievance form on August 14, 2014. See Exhibit H. The grievance form was completed by Mr. McKnight and submitted on August 14, 2014. See Health Care Grievance Form, attached hereto as "Exhibit I." In the form, Mr. McKnight again detailed his injuries and the fact that he was still in pain. See Exhibit I. The form was received on August 15, 2014, was denied on August 20, 2014, and was received back by Mr. McKnight on August 29, 2014. See Exhibit I. His grievance request had been denied without any medical evaluation.

41.     On August 29, 2014, Mr. McKnight requested an appeal of the denial of his August 14, 2014, grievance request. See Non-Emergency Health Services Request form dated August 29, 2014, attached hereto as "Exhibit J." Mr. McKnight was initially provided with a second grievance form instead of a grievance *appeal* form. Mr. McKnight re-requested a grievance appeal form on September 5, 2014. See Non-Emergency Health Services Request form dated September 5, 2014, attached hereto as "Exhibit K." The form to appeal the denial of the grievance was filled out on September 11, 2014, received on September 12, 2014, denied on September 22, 2014, and received back by Mr. McKnight on September 25, 2014. See Health Care Grievance Appeal Form dated September 11, 2014, attached hereto as "Exhibit L." The denial, signed by Chief Diaz, simply stated that Mr. McKnight's "medical problems" had "been

treated" and that "complaints about what may have caused [Mr. McKnight's] injuries must be discussed with the officers." See Exhibit L. Again, no medical evaluation had actually been performed on Mr. McKnight.

42.     At this point, nearly two (2) months after he was brutally assaulted, the only treatment that Mr. McKnight had received was one dose of Tylenol and some ointment for his skin.

43.     Mr. McKnight requested a health care grievance appeal form on September 26, 2014. See Non-Emergency Health Services Request form dated September 26, 2014, attached hereto as "Exhibit M." This was received on September 29, 2014, and a healthcare grievance form was provided to Mr. McKnight on October 2, 2014. Mr. McKnight once again detailed the incident with the Officers on July 31, detailed his injuries, and detailed the fact that he was still in pain. See Health Care Grievance Appeal Form dated October 2, 2014, attached hereto as "Exhibit N." Specifically, Mr. McKnight stated that he was having "frequent headaches," "lower back pain," and "numbness and scarring" of his wrists. See Exhibit N. Additionally, Mr. McKnight stated that "the blunt force that it would take to cause the injuries to my head and face could have easily given me a concussion(s) and be the source of my headaches." See Exhibit N. This form was received on October 6, 2014, and, on October 24, 2014, Chief Diaz signed the form, stating that "[a]n appointment with our physician has been scheduled." See Exhibit N.

44.     Despite Chief Diaz's statement, an appointment with the physician was never scheduled. Mr. McKnight requested another grievance form on November 17, 2014. See Non-Emergency Health Services Request form dated November 17, 2014, attached hereto as "Exhibit O." Mr. McKnight was required to fill out yet another grievance form on November 21,

2014, simply to request the appointment that was allegedly already scheduled for him. See Health Care Grievance Form dated November 21, 2014, attached hereto as "Exhibit P."

45.     On December 1, 2014, over four (4) months after being brutally assaulted, Mr. McKnight saw Dr. Dana Barnes ("Dr. Barnes"). Dr. Barnes spoke with Mr. McKnight and reviewed his booking photos. Dr. Barnes stated that Mr. McKnight should have been taken to the hospital that night to make sure there were no broken bones in face. Furthermore, Dr. Barnes stated in her report that Mr. McKnight's head injuries were "consistent with concussion and post concussive syndrome." See Dr. Barnes' Report, attached hereto as "Exhibit Q."

46.     Dr. Barnes' statements showed that any person could have determined that Mr. McKnight needed medical assistance based upon a simple evaluation. This was the first time in his 4 months of being incarcerated at PDF that Mr. McKnight received a qualified evaluation of his injuries. By that time, Defendants' Votava, Garriott, Chief Diaz, Nurse Okafor, and CMA Peterson's deliberate indifference to Mr. McKnight's serious medical needs caused months of pain and suffering. Dr. Barnes' immediate recognition of Mr. McKnight's condition as well as the harm caused by the delay in medical treatment further evidences that Defendants' Votava, Garriott, Chief Diaz, Nurse Okafor, and CMA Peterson were deliberately indifference to Mr. McKnight's serious medical needs, causing additional harm, for months after Mr. McKnight was injured.

### Count I: Excessive Use of Force Resulting in Injury
### (Against Defendant-Officers Garriott, Votava, and Morgan)

47.     Mr. McKnight re-alleges and incorporates the allegations contained in paragraphs 1 through 35, 45, and 46 above as if fully stated herein.

48. Mr. McKnight's right to be free from cruel and unusual punishment, which is guaranteed by the Fourth Amendment, was violated by the Officers when they knowingly and willfully used, directed, or authorized the excessive force against Mr. McKnight maliciously and sadistically for the very purpose of causing harm to Mr. McKnight and not in a good-faith effort to maintain or restore discipline.

49. As a consequence of Officers' use of excessive and unjustified force in violation of the Fourth Amendment of the United States Constitution, Mr. McKnight has suffered bodily injury resulting in severe pain and suffering, disfigurement, and severe mental anguish.

**WHEREFORE**, the Plaintiff, Avery McKnight, demands judgment against Defendant-Officers Garriott, Votava, and Morgan, jointly and severally, for damages, including punitive damages, costs, attorneys' fees pursuant to 42 U.S.C. § 1988, and a trial by jury of all issues so triable as of right by jury.

### COUNT II: DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS (PHYSICAL)
### (AGAINST DEFENDANT-OFFICERS GARRIOTT AND VOTAVA)

50. Mr. McKnight re-alleges and incorporates the allegations contained in paragraphs 1 through 35, 45, and 46 as if fully stated herein.

51. Mr. McKnight's right to be free from cruel and unusual punishment, guaranteed by the Eighth and Fourteenth Amendments, was violated by Defendants Votava and Garriott when they acted with deliberate indifference by their failure to promptly or properly evaluate, treat, and seek medical assistance for Mr. McKnight's serious physical medical needs.

52.     Defendants Votava and Garriott, although not medical professionals, were nevertheless required to provide medical care or seek medical assistance for Mr. McKnight as he was seriously injured in their custody.

53.     Defendants Votava and Garriott's failure to treat Mr. McKnight's obvious physical injuries that they inflicted upon him, despite their awareness that Mr. McKnight's medical needs presented a substantial risk of serious harm, demonstrated their refusal to act and their refusal to treat Mr. McKnight's serious medical needs, thereby manifesting Defendants Votava and Garriott's deliberate indifference.

54.     As a consequence of Defendants Votava and Garriott's deliberate indifference, Mr. McKnight suffered bodily injury and unnecessary and wanton infliction of pain and suffering, disability, and loss of capacity for the enjoyment of life. The losses are either permanent or continuing, and Mr. McKnight will therefore continue suffering in the future.

**WHEREFORE**, the Plaintiff, Avery McKnight, Jr., hereby demands judgment against Defendants Votava and Garriott, jointly and severally, for damages, including punitive damages, costs, attorneys' fees pursuant to 42 U.S.C. § 1988, and a trial by jury of all issues so triable as of right by jury.

### COUNT III: DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS (MENTAL HEALTH)
### (AGAINST DEFENDANT-OFFICERS GARRIOTT, VOTAVA, AND MORGAN)

55.     Mr. McKnight re-alleges and incorporates the allegations contained in paragraphs 1 through 35 as if fully stated herein.

56.     Mr. McKnight's right to be free from cruel and unusual punishment, guaranteed by the Eighth and Fourteenth Amendments, was violated by Defendants Votava, Garriott, and

Morgan when they acted with deliberate indifference by their failure to promptly or properly evaluate, treat, and seek medical assistance for Mr. McKnight's serious mental health needs.

57.     Defendants Votava, Garriott, and Morgan, although not medical professionals, knew that Mr. McKnight was suffering from a mental illness and further knew that they were required to provide medical care or seek medical assistance for Mr. McKnight.

58.     Defendants Votava, Garriott, and Morgan's failure to address Mr. McKnight's obvious mental health episode, despite their awareness that Mr. McKnight's mental health illness presented a substantial risk of serious harm, demonstrated their refusal to act and their refusal to address Mr. McKnight's serious medical needs, thereby manifesting Defendants Votava, Garriott, and Morgan's deliberate indifference.

59.     As a consequence of Defendants Votava, Garriott, and Morgan's deliberate indifference, Mr. McKnight suffered unnecessary and wanton infliction of pain and suffering, disability, and loss of capacity for the enjoyment of life. The losses are either permanent or continuing, and Mr. McKnight will therefore continue suffering in the future.

**WHEREFORE**, the Plaintiff, Avery McKnight, Jr., hereby demands judgment against Defendant-Officers Votava, Garriott, and Morgan, jointly and severally, for damages, including punitive damages, costs, attorneys' fees pursuant to 42 U.S.C. § 1988, and a trial by jury of all issues so triable as of right by jury.

### COUNT IV: DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS
#### (AGAINST DEFENDANTS CHIEF DIAZ, NURSE OKAFOR, CMA PETERSON)

60.     Mr. McKnight re-alleges and incorporates the allegations contained in paragraphs 1 through 46 above as if fully stated herein.

61.    Mr. McKnight's right to be free from cruel and unusual punishment, guaranteed by the Eighth and Fourteenth Amendments, was violated by Defendants Chief Diaz, Nurse Okafor, and CMA Peterson when they acted with deliberate indifference by their failure to promptly or properly evaluate and treat Mr. McKnight's serious medical needs.

62.    Defendants Chief Diaz, Nurse Okafor, and CMA Peterson were licensed doctors and health care professionals with duties to supervise and to provide medical care to inmates.

63.    Defendants Chief Diaz, Nurse Okafor, and CMA Peterson's failure to promptly evaluate Mr. McKnight's obvious injuries and to treat those injuries, despite their awareness that Mr. McKnight's medical needs presented a substantial risk of serious harm, constituted grossly incompetent and inadequate medical care.

64.    Defendants Chief Diaz, Nurse Okafor, and CMA Peterson's failure to treat Mr. McKnight's obvious injuries, despite their awareness that Mr. McKnight's medical needs presented a substantial risk of serious harm, demonstrated their refusal to act and their refusal to treat Mr. McKnight's serious medical needs, thereby manifesting the Defendants' deliberate indifference.

65.    As a consequence of the Defendants' deliberate indifference, Mr. McKnight suffered bodily injury and unnecessary and wanton infliction of pain and suffering, disability, and loss of capacity for the enjoyment of life. The losses are either permanent or continuing, and Mr. McKnight will therefore continue suffering in the future.

**WHEREFORE,** the Plaintiff, Avery McKnight, Jr., hereby demands judgment against Defendants Chief Diaz, Nurse Okafor, and CMA Peterson, jointly and severally, for damages,

including punitive damages, costs, attorneys' fees pursuant to 42 U.S.C. § 1988, and a trial by jury of all issues so triable as of right by jury.

Respectfully submitted:

**NAPLES & SPENCE, Attorneys at Law, PLLC**
*Counsel for Avery McKnight, Jr.*

/s/ David D. Naples, Jr.
**David D. Naples, Jr., Esq.**
Florida Bar No. 99064
**John J. Spence, Esq.**
Florida Bar No. 70724
2807 North Tenth Street, Suite 7
St. Augustine, Florida 32084
Phone: (904) 657-7117
Fax: (904) 429-1351
Service@NaplesAndSpenceLaw.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished this 28th day of December, 2017, to Counsel for Defendants (Officers Garriott, Votava, and Morgan, Nurse Okafor, and CMA Peterson) **Ashley B. Benson, Esq., Wendy E. Byndlos, Esq., and Sean Granat, Esq., Office of General Counsel,** and to all other Parties listed in the Middle District of Florida's Case Management – Electronic Case Filing.

/s/ David D. Naples, Jr.
**David D. Naples, Jr., Esq.**