UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


AVERY MCKNIGHT, JR.,

                    Plaintiff,

v.                                    Case No. 3:15-cv-159-J-39JRK

JEREMY P. GARRIOTT,
etc.; et al.,

                    Defendants.
_____

**<u>ORDER</u>**

**I.  Status**

Plaintiff Avery McKnight, Jr., proceeding on a Third Amended
Complaint (Complaint (Doc. 72),[1] asserts a violation of his rights
under the Fourth, Eighth and Fourteenth Amendments.[2] Complaint at
17-22.  He claims Officers Jeremy P. Garriott and Stephen P. Votava
used excessive force against him on July 31, 2014, after Plaintiff
had been handcuffed and secured in the back seat of a police car.
<u>Id</u>. at 3.  He claims Sergeant James P. Morgan watched this assault
and beating and failed to intervene.  <u>Id</u>.  Plaintiff further claims
Officers Garriott and Votava were deliberately indifferent to his
serious medical needs in failing to provide or seek medical
assistance for Plaintiff's serious medical needs, instead leaving
him on the ground, handcuffed and hogtied, concussed and bleeding

_____

[1] With respect to the Complaint, the Court references the page
numbers assigned by the electronic filing system.

[2] Plaintiff is represented by counsel.

from his face, for over an hour. Id. Plaintiff claims Defendants Garriott, Votava, and Morgan were deliberately indifferent to his serious mental health needs, as they recognized Plaintiff was suffering from mental illness and exhibiting bizarre behavior, but failed to seek mental health care or document the behavior for reviewing jail staff. Id. at 10-11. In addition, Plaintiff claims Defendants Chief Alvaro Diaz, Chief of the Division of Health Services; Scholastica Okafor, licensed practical nurse; and Melissa Peterson, certified medical assistant,[3] were deliberately indifferent to Plaintiff's serious medical needs once Plaintiff was at the jail. Id. at 12-17, 20-21.

Plaintiff names all Defendants in their individual capacities. Of note, he names Defendant Diaz in his official capacity as well. Id. at 1, 4-5. As relief, Plaintiff seeks compensatory and punitive damages, costs, and attorneys' fees. Id. at 21-22.

In support of his claims, Plaintiff alleges the following factual allegations. Plaintiff, during the evening of July 31, 2014, went to the Federal Bureau of Investigation (FBI) Field Office in Jacksonville, Florida, seeking protection because he believed persons were following him and trying to kill him. Id. at 5. Upon approaching the gate of the facility, Plaintiff spoke with the security officer, Frederick Henshaw. Id. at 5-6. Plaintiff

---

[3] The record show Defendant Peterson is a Certified Nursing Assistant (CNA).

- 2 -

had a pistol on his person, and he showed Mr. Henshaw the pistol in a non-threatening manner. Id. at 6. Mr. Henshaw told Plaintiff to leave. Id. Plaintiff climbed over the gate. Id. Mr. Henshaw drew his pistol and told Plaintiff to drop his pistol. Id. Plaintiff complied, dropping the pistol, and then finished climbing over the fence. Id. Mr. Henshaw detained and handcuffed Plaintiff in the front of his body, without a struggle or incident. Id.

Defendants Garriott, Votava, and Morgan, officers of the Jacksonville Sheriff's Office (JSO), responded to the scene in squad cars. Id. Mr. Henshaw turned Plaintiff over to the police officers. Id. An officer re-cuffed Plaintiff behind his back. Id. The officers escorted Plaintiff from the security building and placed him into the rear driver's seat of Officer Garriott's squad car. Id. at 6-7. Plaintiff had no injuries to his face. Id.

Plaintiff remained alone and handcuffed in the back seat of a squad car for nearly an hour, without incident, while the officers completed their investigation. Id. at 7. The officers returned to the squad car containing Plaintiff. Id. Officer Votava pulled Plaintiff out of the back seat of the squad car by the collar of his shirt, without reason, justification, provocation, or necessity. Id. Plaintiff remained handcuffed behind his back and defenseless. Id. Officer Votava threw Plaintiff to the ground. Id. Plaintiff's head hit the ground, causing him severe pain, dizziness, and loss of vision. Id.

While Plaintiff was on the ground, Officers Garriott and Votava beat, punched, kicked, kneed, and assaulted and battered Plaintiff, causing severe physical injuries to his head and body, including bleeding, bruising, and scarring. Id. Plaintiff pleaded with the officers to stop, and then resorted to screaming "help me." Id. Officer Votava positioned his knee on Plaintiff's temple and banged Plaintiff's head on the concrete. Id. One of the officers, either Votava or Garriott, took a flashlight or other cylindrical item and tried to force it into Plaintiff's mouth. Id. Officer Votava used his knee and body weight to rub and grind Plaintiff's head against the concrete. Id. This caused the skin to peel from Plaintiff's face. Id.

Defendant Sergeant Morgan stood nearby and watched as the officers assaulted and battered Plaintiff. Id. at 8. He failed to intervene or make any attempt to stop the beating. Id. The officers placed Plaintiff in a Total Appendage Restraint (TAR) (a hogtie or hobble, with Plaintiff's legs strained backwards and connected to the handcuffs behind his back). Id. Approximately five minutes elapsed from the time Plaintiff was ripped out of the back seat until he was picked up and thrown back in the squad car. Id. He was not secured with a seat belt. Id. At this point, the officers returned to their squad cars and left the FBI grounds. Id.

During the approximately twelve-mile ride from the FBI office to the JSO pre-trial detention facility (PTDF), Defendant Garriott drove erratically, slamming Plaintiff's head into the door and the back of the front seat. Id. at 9. Repeatedly, Plaintiff asked to be taken to the hospital as he was in severe pain. Id. At the time Plaintiff arrived at the PTDF, he was battered, bleeding, bruised, and swollen. Id.

Upon arrival at the PTDF, Defendants Votava and Garriott removed Plaintiff from the police car and placed him on the ground, on his stomach, still restrained in the TAR. Id. Plaintiff could not move and had difficulty breathing. Id. Plaintiff remained in the TAR, face-down on the ground, for over an hour. Id. Defendants Votava and Garriott mocked, threatened, and intimidated Plaintiff while he was on the ground. Id. They failed to seek medical attention for Plaintiff. Id.

The JSO Response to Resistance (RTR) provision provides officers should handle as a medical emergency observed behaviors of an individual who has lost touch with reality, exhibiting bizarre behavior and mental confusion. Id. at 9-10. Defendants Votava, Garriott, and Morgan observed Plaintiff's bizarre behavior and knew he was suffering from mental illness and had lost touch with reality. Id. at 10. Although the officers later described Plaintiff as acting schizophrenic and suffering from a psychotic break or mental illness, they did not include this information in

the arrest report. Id. The officers did not report Plaintiff's bizarre behavior to the medical staff at the PTDF. Id. Defendants Votava and Garriott did not complete an RTR form noting Plaintiff suffered injury after a use of force, including the use of a TAR. Id. at 11. Defendants Votava and Garriott failed to document that a TAR had been used during the arrest. Id.

Upon being booked at the PTDF, Defendant Okafor performed a medical screening. Id. at 12. Prior to the examination, she told Plaintiff he was not going to be transported to the hospital. Id. Despite Plaintiff's visible injuries, Plaintiff's complaints of pain, and provision of an explanation of what had occurred, Defendant Okafor ignored Plaintiff's complaints and requests for sutures for his wounds and x-rays for his torso, back, and head. Id. Plaintiff exhibited active bleeding from both sides of his face, wrists, and shoulder, and complained of severe head, torso, and back pain due to a beating. Id.

Defendant Okafor provided an ice pack for Plaintiff's swollen face. Id. She did not provide any pain medication or other treatment. Id. at 12-13. She failed to document Plaintiff's injuries or the incident, and she failed to send Plaintiff to Shands Hospital. Id. at 13.

Thereafter, Plaintiff met with Defendant Peterson during the booking process. Id. She was to undertake a further medical screening of Plaintiff, including a visual assessment of

Plaintiff's condition and a review of the arrest and booking report. Id. Defendant Peterson noted a large abrasion that was significant and documented Plaintiff was involved in a physical altercation during his arrest. Id. Plaintiff's face was bloody and swollen, and he asked for medical assistance due to severe pain. Id. at 14. Defendant Peterson cleared Plaintiff for admission to the PTDF, assigned Plaintiff to a top bunk, and told him he did not need any assistance for daily living. Id. Plaintiff had difficulty climbing to the top bunk, dressing himself, and bathing due to his injuries. Id.

Plaintiff completed a health services request form on Friday, August 1, 2014. Id. He complained of pain in his face, hands, and back. Id. He stated his pain was a 10 on a scale of 1 to 10, and he described it as the worst pain of his life. Id. He said the pain occurred often, with thirty episodes in the last twenty-four hours. Id. He suffered blurry vision, nausea, and swelling of the left eye. Id. Plaintiff received no medical attention, treatment, or medication over the weekend. Id. A staff member processed the request on Monday, August 4, 2014. Id.

Thereafter, on August 5, 2014, Plaintiff met with nurses Valerie Thompson and Brenda Davies. Id. Plaintiff described the arrest incident and reported his level of pain. Id. A nurse provided him with a single dose of Tylenol and ointment for his wounds. Id. at 14-15. On August 11, 2014, Plaintiff requested a

grievance form. Staff processed the request on August 13, 2014, and Plaintiff received the form on August 14, 2014. Id. He completed the form on August 14, 2014. Id. Plaintiff explained his injuries and complained of pain. Id. Staff received the form on August 15, 2014, and denied relief on August 20, 2014. Id. Plaintiff received the response on August 29, 2014, denying the grievance without a medical examination. Id.

On that date, Plaintiff requested an appeal form. Id. Instead of being provided with a grievance appeal form, Plaintiff was provided with a second grievance form. Id. Plaintiff re-requested the appeal form on September 5, 2014. Plaintiff received the appeal form and completed it on September 11, 2014. Id. Staff received the form on September 12, 2014, and denied the appeal on September 22, 2014. Id. Plaintiff received the denial on September 25, 2014, signed by Defendant Diaz. Id. Diaz concluded Plaintiff's medical problems had been treated and any complaints about officers' actions should be raised with the officers. Id. at 15-16. Since the incident, Plaintiff had received one dose of Tylenol and skin ointment. Id. at 16.

On September 26, 2014, Plaintiff requested a health care grievance appeal form. Id. Staff received the request on September 29, 2014, and staff provided Plaintiff with a form on October 2, 2014. Id. Plaintiff wrote about the incident, detailed his injuries, and said he was still in pain. Id. He described

frequent headaches, lower back pain, and numbness and scarring of his wrists. <u>Id</u>. He also said the blunt force used by the officers could have given him a concussion and could be the source of his headaches. <u>Id</u>. Staff received the form on October 6, 2014, and Defendant Diaz signed the response stating an appointment with the physician has been scheduled. <u>Id</u>.

An appointment with a physician did not occur in the following weeks. <u>Id</u>. Plaintiff requested another grievance form on November 17, 2014. <u>Id</u>. He completed the grievance on November 21, 2014, asking for the doctor's appointment. <u>Id</u>. at 16-17. Four months after the incident, Plaintiff saw Dr. Dana Barnes. <u>Id</u>. at 17. Dr. Barnes spoke with Plaintiff and reviewed the booking photographs. <u>Id</u>. Dr. Barnes stated that Plaintiff should have been taken to the hospital the night of the arrest to ensure there were no broken bones in his face. <u>Id</u>. Dr. Barnes recorded Plaintiff's head injuries were consistent with concussion and post concussive syndrome. <u>Id</u>. Plaintiff states he went through months of pain and suffering before receiving a qualified evaluation of his injuries. <u>Id</u>.

Two motions are before the Court: Defendants Garriott, Votava, and Morgan's Dispositive Motion for Summary Judgment for Count I-Excessive Force (Motion Count I) (Doc. 75) and Defendants' [Garriott, Votava, Morgan, Diaz, Okafor, Peterson, and City of Jacksonville (Alvaro Diaz, as Chief of the Division of Health

Services)] Dispositive Motion for Summary Judgment (Motion) (Doc. 76).[4]  Plaintiff filed responses to these motions:  Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment as to Count I (Response Count I) (Doc. 80) and Plaintiff's Response in Opposition to Defendants' Dispositive Motion for Summary Judgment (Response) (Doc. 81).  Defendants followed with replies: Defendant's Reply to Plaintiff's Response to Defendants' Dispositive Motion for Summary Judgment for Count I-Excessive Force (Reply Count I) (Doc. 90) and Defendants' Reply to Plaintiff's Response to Defendants' Dispositive Motion for Summary Judgment (Reply) (Doc. 91).  Thereafter, Plaintiff filed his sur-replies: Plaintiff's Sur-Reply to Defendants' Reply to Plaintiff's Response in Opposition to Defendants' Dispositive Motion for Summary Judgment for Count I-Excessive Force (Sur-Reply Count I) (Doc. 95) and Plaintiff's Sur-Reply to Defendants' Reply to Plaintiff's Response in Opposition to Defendants' Dispositive Motion for Summary Judgment (Counts II-IV) (Sur-Reply) (Doc. 96).[5]

---

[4] For ease of reference, the Court refers to the motions and their exhibits (Docs. 75 & 76) and the response and exhibits (Doc. 81), although Defendants have provided redacted versions of some of the exhibits: (Doc. 78 for some of the exhibits to Doc. 75), (Doc. 79 for some of the exhibits to Doc. 76), (Docs. 85 & 87 for all of the exhibits to Doc. 81).  To the extent any of the electronically filed exhibits are locked and cannot be accessed, the reader may refer to the redacted version of the particular exhibit as referenced above.

[5] Where possible, the Court references the page numbers assigned by the electronic filing system throughout this opinion. Otherwise, the Court will refer to the page number on the document.

The Court has thoroughly reviewed all of the submitted exhibits and viewed the video footage provided to the Court. Based on the record before the Court, the Court is not convinced that all of the Defendants have met their burden under the summary judgment standard on all of the claims raised in the Complaint, particularly concerning the defense of qualified immunity.

In this case, Plaintiff alleges that once he was handcuffed behind his back and secured in the back of a police car, officers assaulted him without provocation or just cause. He contends he was pulled from the police car, beaten and hogtied, in violation of the Fourth Amendment. Plaintiff alleges Defendant Morgan stood by and failed to intervene when the officers assaulted Plaintiff. As a result of this alleged beating and hobbling, Plaintiff claims he suffered bleeding from his face, wrists and shoulder, and he complained of head, torso and back pain. The left side of his face was swollen and he had a large, significant abrasion to his head. He complained of severe headaches and post-concussive type symptoms.

Plaintiff contends Defendants Garriott and Votava were deliberately indifferent to his medical needs and Defendants Garriott, Votava, and Morgan were deliberately indifferent to his mental health needs. Plaintiff claims Defendants Diaz, Okafor and Peterson deprived him of medical treatment despite Plaintiff's obvious need for medical care. Plaintiff asserts that the Defendants' failures in this regard resulted in Plaintiff suffering

bodily injury and unnecessary and wanton infliction of pain and suffering, disability, and loss of capacity for the enjoyment of life.  He contends these losses are either permanent or continuing and he may continue to suffer in the future.

## II.  Summary Judgment Standard

"Summary judgment is appropriate only if 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011) (quoting Fed. R. Civ. P. 56(a)).  "If the moving party meets this burden, 'the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor.'"  Ekokotu v. Federal Exp. Corp., 408 F. App'x 331, 333 (11th Cir.) (per curiam) (quoting Fickling v. United States, 507 F.3d 1302, 1304 (11th Cir. 2007)), cert. denied, 565 U.S. 944 (2011).

## III.  Excessive Force

"The Fourth Amendment, in relevant part, guarantees, 'the right of the people to be secure in their persons . . . against unreasonable . . . seizures.'"  Alcocer v. Mills, No. 17-14804, 2018 WL 4870716, at *6 (11th Cir. Oct. 9, 2018) (quoting U.S. Const. amend. IV).  This provision encompasses the "right to be free from the use of excessive force in the course of an arrest." Lee v. Ferraro, 284 F.3d 1188, 1197 (11th Cir. 2002).  Plaintiff alleges a Fourth Amendment violation in his Complaint, and "[p]roperly analyzed, the basis for his § 1983 claim of excessive

force comes under the rubric of the Fourth Amendment . . . ." Jones v. Marcum, 197 F.Supp.2d 991, 998 (S.D. Ohio 2002). In this regard, there is an "objective reasonableness" standard. Graham v. Connor, 490 U.S. 386, 388 (1989).

The Eleventh Circuit has "indirectly countenanced the application of the Fourth Amendment to post-arrest, pre-detention excessive force claims . . . ." Calhoun v. Thomas, 360 F.Supp.2d 1264, 1272 (M.D. Ala. March 11, 2005). This Court more directly recognizes that the Fourth Amendment provides the appropriate framework for analyzing post arrest, pre-detention claims finding: "Fourteenth Amendment analysis does not begin until 'after the incidents of arrest are completed, after the plaintiff has been released from the arresting officer's custody, and after the plaintiff has been in detention awaiting trial for a significant period of time.'" Sherman v. Blair, No. 5:15-cv-36-Oc-34PRL, 2015 WL 9685940, at *4 n.9 (M.D. Fla. Dec. 18, 2015) (quoting Polanco v. City of Marco Island, No. 2:10-CV-605-FTM-29, 2011 WL 2911002, at *3 (M.D. Fla. July 19, 2011)) (quoting Gutierrez v. City of San Antonio, 139 F.3d 441, 452 (5th Cir. 1998), report and recommendation by 2016 WL 99570 (M.D. Fla. Jan. 8, 2016)). See Reese v. Herbert, 527 F.3d 1253, 1261 n.11 (11th Cir. 2008) (finding Gutierrez provides the correct standard to make the proper determination, and the excessive force claim should be analyzed in the context of the Fourth Amendment only); Garrett v. Athens-Clarke Cty., Ga., 378 F.3d 1274 n.11 (11th Cir. 2004) (per curiam) (same).

Notably, Defendants do not contend Plaintiff's excessive use of force claim should be analyzed under Fourteenth Amendment rubric instead of the Fourth Amendment. Indeed, they specifically reference the Fourth Amendment and focus their inquiry on whether the force used by the officers was reasonable, relying on Graham and Draper v. Reynolds, 369 F.3d 1270, 1277-78 (11th Cir.) (addressing a Fourth Amendment claim regarding the use of a taser gun during an arrest), cert. denied, 543 U.S. 988 (2004). Motion Count 1 at 14-15.

In this instance, the facts, as supported by the record before the Court, fall closer to the arrest end, as Plaintiff had not been released from the arresting officers' custody when the use of force took place. Garrett, 378 F.3d at 1279 n.11 (finding the Fourth Amendment the more appropriate framework for post-arrest, pre-detention cases). As such, the Court is required to look "with the eye of the objectively reasonable officer on the scene." Id. at 1281. This inquiry is fact intensive. West v. Davis, 767 F.3d 1063, 1067 (11th Cir. 2014).

> Whether the force used is reasonable turns on "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396, 109 S.Ct. at 1872. An officer will be entitled to qualified immunity if his actions were "objectively reasonable"—that is, if a reasonable officer in the same situation would have believed that the force used was not

excessive.  <u>See</u> <u>Anderson v. Creighton</u>, 483 U.S.
635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

<u>Thornton v. City of Macon</u>, 132 F.3d 1395, 1400 (11th Cir. 1998)

(per curiam).

Since the Court is asking whether the officer's actions are

objectively reasonable in light of the circumstances, the Court

does not question the officer's underlying intent or motivation.

<u>Crosby v. Monroe Cty.</u>, 394 F.3d 1328, 1333 (11th Cir. 2004)

(citation omitted).  In <u>Vinyard v. Wilson</u>, 311 F.3d 1340, 1347

(11th Cir. 2002), the Eleventh Circuit provides the relevant

evaluation process:

> To balance the necessity of the use of
> force used against the arrestee's
> constitutional rights, a court must evaluate
> several factors, including "the severity of
> the crime at issue, whether the suspect poses
> an immediate threat to the safety of the
> officers or others, and whether he is actively
> resisting arrest or attempting to evade arrest
> by flight."  <u>Graham</u>, 490 U.S. at 396, 109
> S.Ct. 1865; <u>see also</u> <u>Lee</u>, 284 F.3d at 1197-98
> (citing <u>Leslie v. Ingram</u>, 786 F.2d 1533, 1536
> (11th Cir. 1986) and stating that "in
> determining if force was reasonable, courts
> must examine (1) the need for the application
> of force, (2) the relationship between the
> need and amount of force used, and (3) the
> extent of the injury inflicted") (footnote
> omitted).  As this Court also recently
> explained in <u>Lee</u>, "<u>Graham</u> dictates
> unambiguously that the force used by a police
> officer in carrying out an arrest must be
> reasonably proportionate to the need for that
> force, which is measured by the severity of
> the crime, the danger to the officer, and the
> risk of flight."  284 F.3d at 1198.

More recently, the Eleventh Circuit opined:

> "At summary judgment, we cannot simply accept
> the officer's subjective version of events,
> but rather must reconstruct the event in the
> light most favorable to the non-moving party
> and determine whether the officer's use of
> force was excessive under those
> circumstances." <u>Fils v. City of Aventura</u>, 647
> F.3d 1272, 1288 (11th Cir. 2011). "[T]he
> question we ask is whether, under [the
> plaintiff's] version of the facts, [the
> officer] behaved reasonably in the light of
> the circumstances before him." <u>Galvez v.
> Bruce</u>, 552 F.3d 1238, 1243 (11th Cir. 2008)
> (citation and internal quotation marks
> omitted). The excessive-force "area is one in
> which the result depends very much on the
> facts of each case." <u>Brosseau[v. Haugen]</u>, 543
> U.S. [194] at 201, 125 S.Ct. at 600 [2004].
> Excessive-force claims are fact-specific;
> whether the force an officer uses is
> reasonable "requires careful attention to the
> facts and circumstances of each particular
> case." <u>Graham v. Connor</u>, 490 U.S. 386, 396,
> 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989).

<u>Stephens v. DeGiovanni</u>, 852 F.3d 1298, 1315 (11th Cir. 2017).

Thus, this Court's analysis requires a careful review of the facts: "[i]n analyzing whether excessive force was used, courts must look at the totality of the circumstances: not just a small slice of the acts that happened at the tail of the story." <u>Garrett</u>, 378 F.3d at 1280. It should be noted, "force is more likely to be unlawful if it occurred after a suspect was already secured, the arrest effected, and danger vitiated, as opposed to force that occurred while the officer was still securing a suspect." <u>Lloyd v. Tassell</u>, 318 F. App'x 755, 758 (11th Cir. 2009) (per curiam) (citing <u>Lee v. Ferraro</u>, 284 F.3d at 1199-1200).

Plaintiff also claims Defendant Morgan failed to intervene and protect Plaintiff from the use of excessive force. This Circuit recognizes there is an enforceable claim for failure to intervene:

> We have previously said that an officer can be liable for failing to intervene when another officer uses excessive force. See Ensley v. Soper, 142 F.3d 1402, 1407-08 (11th Cir. 1998) ("[I]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable[.]"); see also Riley v. Newton, 94 F.3d 632, 635 (11th Cir. 1996); Byrd v. Clark, 783 F.2d 1002, 1007 (11th Cir. 1986); Fundiller v. City of Cooper City, 777 F.2d 1436, 1441-42 (11th Cir. 1985). This liability, however, only arises when the officer is in a position to intervene and fails to do so. See Ensley, 142 F.3d at 1407 ("[F]or an officer to be liable for failing to stop police brutality, the officer must be in a position to intervene[.]").

Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 924-25 (11th Cir. 2000). See also Skrtich v. Thornton, 280 F.3d 1295, 1301 (11th Cir. 2002) (noting that an allegation that an officer was present at the scene and failed to take reasonable steps to protect a victim from another officer's use of excessive force states a claim for relief) (citation and quotation omitted).

## IV. Medical Care

Plaintiff alleges the officers failed to ensure he received medical attention. The Eighth Amendment is interpreted as prohibiting deliberate indifference to serious medical needs of prisoners. Estelle v. Gamble, 429 U.S. 97, 102 (1976). Plaintiff,

at the time of the incident, was not a convicted prisoner.  Thus, his rights did not arise under the Eighth Amendment.  However, in practical effect, Plaintiff's claims regarding the denial of medical care are subjected to the same minimum standard of care as that allowed by the Eighth Amendment.  Cook ex rel. Tessier v. Sheriff of Monroe County, Fla., 402 F.3d 1092, 1115 (11th Cir. 2005).  Therefore, this Court must give these Fourteenth Amendment claims the same scrutiny as if Plaintiff had brought these Fourteenth Amendment claims under the Eighth Amendment.  Melton v. Abston, 841 F.3d 1207, 1220 (11th Cir. 2016) (per curiam) (addressing allegations of deliberate indifference to the serious medical needs of a pretrial detainee).

In order to prevail on his claim of deliberate indifference to a serious medical need,[5] Plaintiff must demonstrate "(1) a serious

---

[5] Against the officers, Plaintiff raises a claim of deliberate indifference to his serious mental health needs.  Importantly, "[p]sychiatric needs can constitute serious medical needs, and severe inattention to these needs can constitute deliberate indifference."  Bozeman v. Orum, 199 F.Supp.2d 1216, 1231 (M.D. Ala. 2002) (citing Greason v. Kemp, 891 F.2d 829, 834 n. 10 (11th Cir.1990)), on reconsideration in part sub nom. Bozeman ex rel. Est. of Haggard v. Orum, 302 F.Supp.2d 1310 (M.D. Ala. 2004), aff'd by 422 F.3d 1265 (11th Cir. 2005).  Indeed, it has been recognized that, under the Eighth Amendment, prisoners have the right to receive medical treatment for illness and injuries, which encompasses the right to psychiatric and mental health care; therefore, an arrestee would have comparable rights under the Fourteenth Amendment.  See Belcher v. City of Foley, Ala., 30 F.3d 1390, 1396 (11th Cir. 1994); Estelle v. Gamble, 429 U.S. at 103-105; Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir. 1986).

medical need; (2) a defendant's deliberate indifference to that need; and (3) causation between that indifference and the plaintiff's injury." Id. (citation omitted). To establish deliberate indifference to a serious medical need, Plaintiff must shoulder three burdens; he must satisfy the objective component (showing he had a serious medical need), the subjective component (showing the official acted with deliberate indifference to his serious medical need), and causation (showing the injury was caused by the Defendant's wrongful conduct). Goebert v. Lee County, 510 F.3d 1312, 1326 (11th Cir. 2007).

Recently, the Eleventh Circuit explained, in order to prove deliberate indifference to a serious medical need, a plaintiff must demonstrate (1) the official's subjective knowledge of a risk of serious harm; (2) the official's disregard of that risk; (3) by conduct that is more than **mere negligence**.[6] Daniels v. Jacobs, No. 17-14429, 2018 WL 4998130, at *8 (11th Cir. Oct. 16, 2018) (per

---

[6] The Court emphasizes this standard of proof because both Plaintiff and Defendants refer to the third burden as a requirement that a plaintiff show conduct that is more than gross negligence, not mere negligence. Motion at 12; Response at 5. The Eleventh Circuit has opined that the standard in McElligott v. Foley, 182 F.3d 1248, 1255-59 (11th Cir. 1999) (employing the "more than mere negligence" standard) is the appropriate one, as it is more consistent with Farmer v. Brennan, 511 U.S. 825, 847 (1994), and McElligott is the first Eleventh Circuit case, following Farmer, to address the question of degree of culpability pursuant to Farmer. Melton, 841 F.3d at 1223 n.2 (11th Cir. 2016). As such, the Eleventh Circuit directed that this standard of degree of culpability be followed. Relying on the guidance provided in McElligott and Melton and the more recent cases addressing this matter, this Court will heed the Eleventh Circuit's directive and employ the "more than mere negligence" standard.

curiam) (emphasis added).  See <u>Nam Dang, by and through Vina Dang</u> <u>v. Sheriff, Seminole Cty. Fla.</u>, 871 F.3d 1272, 1280 (11th Cir. 2017) (finding in order to establish deliberate indifference, the pretrial detainee must prove these three factors); <u>McLeod v. Sec'y,</u> <u>Fla. Dep't of Corr.</u>, 679 F. App'x 840, 843 (11th Cir. 2017) (per curiam) (same, relying on <u>Melton</u>, 841 F.3d 1223 and disagreeing with an Eleventh Circuit panel decision stating a claim of deliberate indifference requires proof of more than gross negligence).

In employing this standard, the Eleventh Circuit opined:

> An official disregards a serious risk by more than mere negligence "when he [or she] knows that an inmate is in serious need of medical care, but he [or she] fails or refuses to obtain medical treatment for the inmate." <u>Lancaster v. Monroe Cty., Ala.</u>, 116 F.3d 1419, 1425 (11th Cir. 1997), <u>overruled</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>LeFrere v. Quezada</u>, 588 F.3d 1317, 1318 (11th Cir. 2009). Even when medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs. <u>See</u> <u>Harris v. Coweta Cty.</u>, 21 F.3d 388, 393-94 (11th Cir. 1994) (citing <u>Brown v.</u> <u>Hughes</u>, 894 F.2d 1533, 1537-39 (11th Cir. 1990)). Further, "medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." <u>Mandel</u> <u>v. Doe</u>, 888 F.2d 783, 789 (11th Cir. 1989) (citations omitted). However, medical treatment violates the Constitution only when it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." <u>Rogers</u> <u>v. Evans</u>, 792 F.2d 1052, 1058 (11th Cir. 1986) (citation omitted).

<u>Nam Dang by and through Vina Dang</u>, 871 F.3d at 1280.

Plaintiff claims Defendants Diaz, Okafor, and Peterson, medical professionals, were deliberately indifferent to his serious medical needs. Deliberate indifference may result from failure to provide medical care and/or excessive delay in providing medical care. Lelieve v. Chief of Police Manuel Oroso, 846 F.Supp.2d 1294, 1304 (S.D. Fla. Feb. 14, 2012). It is important to remember that "[m]ere incidents of negligence or malpractice do not rise to the level of constitutional violations." Daniels, 2018 WL 4998130, at * 9 (quoting Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991)).

Finally, with respect to the claim of deprivation of medical care, Plaintiff names Defendant Alvaro Diaz in his official capacity as Chief of the Division of Health Services. "Congress did not intend to create liability under § 1983 unless action pursuant to an official policy or custom caused a constitutional tort." Monell v. Dep't of Soc. Serv., 436 U.S. 658, 691 (1978). Apparently, Plaintiff contends Defendant Diaz, at the time of the incident, exercised control over and had supervisory authority over the provision of medical care for pretrial detainees, including the coordination of additional medical care outside of the pretrial detention facility.

Plaintiff names Defendant Diaz, the former Chief of the Division of Health Services, in his official capacity as a policy maker. In this regard,

> "[a] policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." <u>Sewell v. Town of Lake Hamilton</u>, 117 F.3d 488, 489 (11th Cir. 1997). A custom is an unwritten practice that is applied consistently enough to have the same effect as a policy with the force of law. <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988). Demonstrating a policy or custom requires "show[ing] a persistent and wide-spread practice." <u>Depew v. City of St. Mary's, Ga.</u>, 787 F.2d 1496, 1499 (11th Cir. 1986).

<u>Goebert</u>, 510 F.3d at 1332. Also with respect to causation, if a defendant is the final authority on policy, "then a causal link would exist sufficient for potential liability under section 1983." <u>Howell v. Evans</u>, 922 F.2d 712, 724 (11th Cir. 1991), <u>opinion reinstated by</u> <u>Howell v. Burden</u>, 12 F.3d 190 (11th Cir. 1994).

## V. Qualified Immunity

Defendants raise the defense of qualified immunity. The Eleventh Circuit recently explained:

> The qualified-immunity defense reflects an effort to balance "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." <u>Pearson v. Callahan</u>, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). The doctrine resolves this balance by protecting government officials engaged in discretionary functions and sued in their individual capacities unless they violate "clearly established federal statutory or constitutional rights of which a reasonable person would have known." <u>Keating v. City of Miami</u>, 598 F.3d 753, 762 (11th Cir. 2010) (quotation marks and brackets omitted).

As a result, qualified immunity shields from liability "all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002). But the doctrine's protections do not extend to one who "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff]." Harlow v. Fitzgerald, 457 U.S. 800, 815, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (internal quotation marks and alteration omitted).

To invoke qualified immunity, a public official must first demonstrate that he was acting within the scope of his or her discretionary authority. Maddox v. Stephens, 727 F.3d 1109, 1120 (11th Cir. 2013). As we have explained the term "discretionary authority," it "include[s] all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." Jordan v. Doe, 38 F.3d 1559, 1566 (11th Cir. 1994) (internal quotation marks omitted). Here, it is clear that Defendant Officers satisfied this requirement, as they engaged in all of the challenged actions while on duty as police officers conducting investigative and seizure functions.

Because Defendant Officers have established that they were acting within the scope of their discretionary authority, the burden shifts to [the plaintiff] to demonstrate that qualified immunity is inappropriate. See id. To do that, [the plaintiff] must show that, when viewed in the light most favorable to him, the facts demonstrate that Defendant Officers violated [Plaintiff's] constitutional right and that that right was "clearly established ... in light of the specific context of the case, not as a broad general proposition[,]" at the time of Defendant officers' actions. Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), overruled in part on other grounds by Pearson, 555 U.S. 223, 129 S.Ct.

> 808. We may decide these issues in either
> order, but, to survive a qualified-immunity
> defense, [the plaintiff] must satisfy both
> showings. <u>Maddox</u>, 727 F.3d at 1120-21
> (citation omitted).

<u>Jones v. Fransen</u>, 857 F.3d 843, 850-51 (11th Cir. 2017).

The Court will first address the assertion of the defense of qualified immunity with respect to the claims of excessive force and failure to intervene raised against Defendants Garriott, Votava, and Morgan. Second, the Court will address the asserted defense of qualified immunity with regard to the claims of deliberate indifference to serious medical or mental health needs raised against Defendants Garriott, Votava, Morgan, Diaz, Okafor, and Peterson.

Defendants Garriott, Votava, and Morgan state, for purposes of the Motion Count I, they accept Plaintiff's version of the events as true.[7] Motion Count I at 2 n.1. Defendants note, however, that they dispute many of Plaintiff's factual allegations and his version of the events, and Defendants reserve the right to challenge Plaintiff's version of events in other contexts. <u>Id</u>. at 5 n.2. In the Motion, Defendants Garriott, Votava, Morgan, Diaz, Okafor, Peterson, and the City of Jacksonville (Alvaro Diaz, as Chief of the Division of Health Services), also state they accept as true Plaintiff's allegations, but they submit that they dispute

---

[7] Under the Undisputed Statement of Facts section of the Motion Count I, Defendants refer to their own sworn statements and other documents, the content of which differs substantially from Plaintiff's version of the events. Motion Count I at 2-11.

many of the allegations and reserve the right to contest the facts in other contexts.[8]  Motion at 2 n.1.

Of importance for this Court's review, Defendants raise the affirmative defense of qualified immunity.  Consequently, this Court must resolve all issues of material fact in favor of Plaintiff.  <u>Stephens</u>, 852 F.3d at 1313.  Employing Plaintiff's version of the facts, the Court then makes the determination as to whether a particular defendant is entitled to qualified immunity.  <u>Id</u>. (citing <u>Durruthy v. Pastor</u>, 351 F.3d 1080, 1084 (11th Cir. 2003)).  Therefore, the Court looks to the evidence of Plaintiff and gives it all favorable, justifiable inferences.  <u>Id</u>. (citation omitted).  In making this analysis, "material issues of disputed fact are not a factor in the court's analysis[.]"  <u>Id</u>. at 1314 (citation omitted).

## A.  Excessive Force and Failure to Intervene

In undertaking a qualified immunity analysis, since qualified immunity is a defense not only from liability, but from suit, the Court must ask whether the officer's or individual's conduct violated a federal right, again with the facts taken in the light most favorable to Plaintiff, and then inquire as to whether the right in question was clearly established; however, it is entirely

---

[8] Under the Undisputed Statement of Facts section of the Motion, Defendants refer to their own sworn statements and other documents, which contradict many of Plaintiff's factual allegations.  Motion at 2-11.

in the Court's discretion as to the order of review. <u>Id</u>. (citations omitted).

It is important to recognize:

> "Qualified immunity shields government officials from liability for civil damages for torts committed while performing discretionary duties unless their conduct violates a clearly established statutory or constitutional right." <u>Hadley v. Gutierrez</u>, 526 F.3d 1324, 1329 (11th Cir. 2008). "A successful section 1983 action requires that the plaintiff show [he] was deprived of a federal right by a person acting under color of state law." <u>Almand v. DeKalb Cty.</u>, 103 F.3d 1510, 1513 (11th Cir. 1997). "A person acts under color of state law when he acts with authority possessed by virtue of his employment with the state." <u>Griffin v. City of Opa-Locka</u>, 261 F.3d 1295, 1303 (11th Cir. 2001). From the outset of its qualified-immunity jurisprudence, the Supreme Court has instructed "government officials performing discretionary functions" must "not violate clearly established statutory or constitutional rights of which a reasonable person would have known," <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), meaning, on the facts alleged, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted," <u>Saucier v. Katz</u>, 533 U.S. 194, 202, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001). Since there is no dispute the government official . . . . was "acting within the scope of his discretionary authority" in his road patrol . . . . when he encountered and arrested [the plaintiff], the burden shifts to [the plaintiff] "to show that qualified immunity is not appropriate." <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1194 (11th Cir. 2002) (citation and internal quotation marks omitted).

<u>Stephens</u>, 852 F.3d at 1314.

In <u>Stephens</u>, the Eleventh Circuit addressed qualified immunity

in the Fourth Amendment context,

> "In an excessive force case arising out
> of an arrest, whether a constitutional
> violation occurred is governed by the Fourth
> Amendment's 'objective reasonableness'
> standard." <u>Hadley</u>, 526 F.3d at 1329 (quoting
> <u>Brosseau v. Haugen</u>, 543 U.S. 194, 197, 125
> S.Ct. 596, 598, 160 L.Ed.2d 583 (2004)).
> Because the objective-reasonableness test
> applies to Fourth Amendment,
> qualified-immunity analysis, courts do not
> speculate as to what government officials
> subjectively thought but assess their actions
> for objective reasonableness under established
> constitutional law. <u>See</u> <u>Harlow</u>, 457 U.S. at
> 818, 102 S.Ct. at 2738. "At summary judgment,
> we cannot simply accept the officer's
> subjective version of events, but rather must
> reconstruct the event in the light most
> favorable to the non-moving party and
> determine whether the officer's use of force
> was excessive under those circumstances." <u>Fils</u>
> <u>v. City of Aventura</u>, 647 F.3d 1272, 1288 (11th
> Cir. 2011). "[T]he question we ask is whether,
> under [the plaintiff's] version of the facts,
> [the officer] behaved reasonably in the light
> of the circumstances before him." <u>Galvez v.</u>
> <u>Bruce</u>, 552 F.3d 1238, 1243 (11th Cir. 2008)
> (citation and internal quotation marks
> omitted). The excessive-force "area is one in
> which the result depends very much on the
> facts of each case." <u>Brosseau</u>, 543 U.S. at
> 201, 125 S.Ct. at 600. Excessive-force claims
> are fact-specific; whether the force an
> officer uses is reasonable "requires careful
> attention to the facts and circumstances of
> each particular case." <u>Graham v. Connor</u>, 490
> U.S. 386, 396, 109 S.Ct. 1865, 1872, 104
> L.Ed.2d 443 (1989).
>
> In an excessive-force case, where
> qualified immunity has been pled, "[o]ur
> circuit uses two methods to determine whether
> a reasonable officer would know that his
> conduct is unconstitutional" under the Fourth
> Amendment. <u>Fils</u>, 647 F.3d at 1291. The first

considers "the relevant case law at the time of the violation; the right is clearly established if a concrete factual context exists so as to make it obvious to a reasonable government actor that his actions violate federal law." <u>Id</u>. (citation, internal quotation marks, and alteration omitted). "This method does not require that the case law be 'materially similar' to the officer's conduct;" "[b]ut, where the law is stated in broad propositions, 'a very high degree of prior factual particularity may be necessary.'" <u>Id</u>. (quoting <u>Hope v. Pelzer</u>, 536 U.S. 730, 740-41, 122 S.Ct. 2508, 2516, 153 L.Ed.2d 666 (2002)).

The second method looks "not at case law, but at the officer's conduct, and inquires whether that conduct 'lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the officer, notwithstanding the lack of fact-specific case law.'" <u>Id</u>. (quoting <u>Vinyard v. Wilson</u>, 311 F.3d 1340, 1355 (11th Cir. 2002)) (alteration omitted) (emphasis added). The cases fitting this method are known as "obvious clarity," <u>id</u>. (quoting <u>Vinyard</u>, 311 F.3d at 1355), "a 'narrow exception' to the normal rule that only case law and specific factual scenarios can clearly establish a violation," <u>id</u>. (quoting <u>Lee</u>, 284 F.3d at 1198-99).

<u>Stephens</u>, 852 F.3d at 1314–16.

This Court has undertaken a thorough review of the record before the Court, including the video evidence,[9] and acknowledges

---

[9] The video shows a good portion of the events leading up to the use of force; however, it is very difficult to see the actual use of force due to the distance, flashing activated police car lights, and the location of the use of force, down by the road, away from the well-lit guard gate. At most, the Court is able to see a flurry of movement of individuals, but is unable to determine the number of individuals involved in the incident, the identity of the individuals involved, or exactly what the individuals are doing during the incident.

that the facts must be taken in the light most favorable to Plaintiff when addressing the affirmative defense of qualified immunity. The Court will not reiterate all of the record citations as they are provided in the motions, responses, replies, sur-replies, documents, and video evidence previously submitted by the parties and do not bear repeating here.

Taking the facts in the light most favorable to Plaintiff, the Court highlights facts related to the excessive use of force not previously mentioned. Officer Shaw,[10] an officer at the scene, recognized Plaintiff from another incident at the Embassy Suites in Jacksonville Florida, where Officer Shaw observed Plaintiff's extremely paranoid behavior, exhibited by his expressing fear that someone was following him and trying to kill him. Shaw described Plaintiff as not thinking clearly at either incident.[11]

At the time of his arrest, Plaintiff was suffering from mental illness, including auditory and visual delusions, was paranoid and schizophrenic, and was apparently suffering from a psychotic

---

[10] Officer Shaw states he was one of the officers that went into the security building and he actually told Plaintiff he was one of the officers from the Embassy Suites incident, an incident where Plaintiff previously interacted with JSO police officers.

[11] On July 9, 2014, in another incident involving the police, the police arrested Plaintiff at Baptist Hospital and put him in mental health lockdown. At the time of his arrest, Plaintiff was wearing a bullet-proof vest and falsely believed someone was in the trunk of his car.

break.[12]    Officer Garriott played on Plaintiff's delusions by
telling Plaintiff the officers knew why someone was following him
and Garriott was going to drop Plaintiff off with his buddies up
the road.   Plaintiff became fearful of the police officers after
this taunting from Officer Garriott.   Plaintiff yelled "hey" to an
individual that exited the FBI building, hoping for some
assistance.[13]    Sometime well-after Plaintiff yelled hey to the
passing FBI employee, the use of force took place.

Officer Garriott came to the rear, passenger-side door of the
patrol car, opened the door, and directed Plaintiff to put his feet
up on the seat.   Plaintiff started to comply and put one foot up on
the seat and started to put his second foot on the seat when he
observed Garriott holding a hobble.   Believing Officer Garriott
intended to tie Plaintiff's legs together, Plaintiff put his feet
back on the floor of the car.   Garriott told Plaintiff to listen or
else Garriott would come snatch Plaintiff out of the car.   Garriott
shut the passenger-side rear door.   At that point, Officer Votava,
used force to remove Plaintiff from the vehicle as described
previously.[14]

---

[12] Eventually, Plaintiff was found not guilty by reason of
insanity as to the charges of armed trespass and possession of a
firearm by a convicted felon.

[13] Approximately thirty minutes elapsed between the time the
FBI employee exited the building and when Plaintiff was pulled out
of the police car.

[14] Officer Votava is six feet tall and weighs approximately 280
pounds; Plaintiff is five foot seven inches tall and weighed

Officer Shaw was tasked with the van forfeiture paperwork at the scene.  Of note, the notice of seizure form and the forfeiture form are names interchangeably used for the same form.[15]  Officer Shaw said the forfeiture paperwork he was preparing was not completed until the next day, when he came back on duty.  He submitted the form on August 1, 2014, at 8:46 p.m.  He explained he filled out an outdated Form 1714 at the scene, retrieved from a bin in his car, and then the next night filled out the updated form and submitted it.  He is not sure if he had completed a form when he got out of his car.  After getting out of his car, he saw Officers Votava and Garriott either putting Plaintiff in the back seat of the police car or they were in the process of putting him in the back seat.  The officers were kneeling in the lower door frame.  Sergeant Morgan was standing a couple of feet away from the officers.

As to the location of Sergeant Morgan during this incident, Morgan was in his car, in close enough proximity to see a lot of movement and Officer Votava and Plaintiff go to the ground.  Plaintiff fell next to Sergeant Morgan's car.  Sergeant Morgan

approximately 185 pounds at the time of the incident.

[15] Officers Garriott and Votava apparently dispute this fact in part, claiming they were working on the forfeiture paperwork, and they needed to open the car door to speak with Plaintiff and to prepare him to sign the paperwork.  They claim that when the car door was opened, Plaintiff came out of the car and tried to head-butt Votava or run away.  Officer Garriott said he was at the trunk of his car retrieving the notice of seizure form when he saw Plaintiff try to lunge past Officer Votava.

stepped out of his car and watched the rest of the incident. Garriott used Sergeant Morgan's hobble as Morgan was standing a couple of feet away.

Initially, the Court finds the officers were acting within their discretionary powers when they arrested Plaintiff. Next, the Court asks whether, under Plaintiff's version of the facts, a constitutional violation occurred. In this instance, the Court asks whether Defendants Garriott and Votava violated Plaintiff's right to be free from excessive force and whether Sergeant Morgan failed to intervene.

Under the Fourth Amendment, officers are prohibited from beating or assaulting restrained, non-resisting suspects. <u>Reese v. Herbert</u>, 527 F.3d at 1274. Plaintiff claims that after he was handcuffed behind his back and sitting in the backseat of a police car, compliant and not struggling, acting out, or kicking the seat, Officer Garriott came to hogtie him. Plaintiff refused to submit to being hogtied and returned his feet to the floor of the car. Officer Garriott closed the car door. Officer Votava opened the driver's side backseat door and forcibly removed Plaintiff from the backseat of the police car by snatching him out of the car, where he hit his head on the concrete. Officer Votava got on top of Plaintiff and banged Plaintiff's head onto the concrete and used his knee to grind Plaintiff's face on the concrete. An officer attempted to put a cylinder or flashlight into Plaintiff's mouth. Finally, Officer Garriott hogtied Plaintiff in a TAR. Plaintiff

- 32 -

remained hogtied, with his legs bent behind him and hinged to the handcuffs behind his back, for over an hour.

The booking photographs taken at the PTDF show visible injuries to Plaintiff's face, including significant swelling and abrasions. The video shows much of what happens prior to the use of force, but it does not clearly show the events at the time of the alleged use of excessive force. In ruling on summary judgment, the Court views the facts and all reasonable inferences in the light most favorable to Plaintiff except "to the extent [Plaintiff's] version of the facts is clearly contradicted by the [video], such that no reasonable jury could believe it." Beshers v. Harrison, 495 F.3d 1260, 1262 n.1 (11th Cir. 2007) (alterations added); see Mathis v. Adams, 577 F. App'x 966, 968 (11th Cir. 2014) (stating "the district court could not credit [plaintiff's] allegation that the defendants beat him for thirty minutes, as that allegation was 'blatantly contradicted by the [video] record, so that no reasonabl[e] jury could believe it[]'").

The Court relies on the video evidence, such that it is. See Bodden v. Bodden, 510 F. App'x 850, 852 n.2 (11th Cir. 2013) (per curiam) ("We need not adopt the non-moving party's version of the facts to the extent it is clearly contradicted by a videotape such that no reasonable jury could believe it."); Sims v. Quilliams, 378 F. App'x 945, 946 (11th Cir. 2010) (per curiam) ("Because the district court relied on the facts as it observed them in the tapes, it did not err by relying on these facts rather than on [the

plaintiff's] contradictory assertions."); <u>White v. Georgia</u>, 380 F.
App'x 796, 797 (11th Cir. 2010) (per curiam) ("It is settled law
that where the record tells two different stories, one blatantly
contradicted by the evidence, the court is not required to adopt
that version of the facts when ruling on summary judgment.").  In
this instance, Plaintiff's description of the use of force is not
blatantly contradicted by the video evidence.

     The Court looks to the severity of the crime, the danger to
the officers, and the risk of flight.  Although the crimes were
felonies and were serious, Plaintiff was already restrained,
handcuffed behind his back, and secured in the back seat of a
police car.  At this point, there was no real danger to the
officers.  Under Plaintiff's version of the facts, he was not
presenting a danger to himself or the officers while seated in the
back of the police car.  Also, under Plaintiff's version of the
facts, he was not a risk of flight, as he was safely secured, hands
handcuffed behind his back, and waiting for the officers to
complete their investigation while restrained in the back seat of
the police car.

     Based on Plaintiff's version of the facts, there was no
justification or provocation for the officers to decide to hogtie
Plaintiff.  Although Plaintiff admits that, while confined in the
back seat of the police car, he yelled "hey" to the person who
exited the FBI building, he was cooperative with the officers and
was securely restrained in the back seat of the police car for an

extensive period of time after he yelled and before the officers opened the car doors to hogtie him.

Crediting Plaintiff's story, there was no need for Officer Votava to forcefully remove Plaintiff from the car, pinning him to the ground, grinding his face in the ground and using other force, for Officer Garriott to hogtie Plaintiff, or for either officer to try to force something into Plaintiff's mouth.  <u>See</u> <u>Galvez v. Bruce</u>, 552 F.3d 1238, 1243-44 (11th Cir. 2008) (finding deputy not entitled to qualified immunity with regard to his use of force when the plaintiff offered no physical resistance, was handcuffed, and posed no danger to the officer and no risk of flight).

Again, the question is whether the officers' conduct was objectively reasonable under the facts taken in the light most favorable to Plaintiff.  Of course, the officers had the right to use some degree of physical coercion to effect the arrest, but in this case, Plaintiff was already handcuffed behind his back and secured in a police car.  Here, there was no need for the application of force, the amount of force was greater than any need, and the injury significant.[16]  Therefore, the force used by the officers was not reasonably proportionate to the need for the use of force, unlike the situation presented in <u>Lewis v. City West</u>

---

[16] In the Fourth Amendment excessive-force context, "[a]lthough the extent of any injury may be relevant, the core judicial inquiry" is "the nature of the force." <u>Williams v. Deal</u>, 659 F. App'x 580, 596 (11th Cir. 2016) (per curiam), <u>cert</u>. <u>denied</u>, 137 S.Ct. 1346 (2017).

Palm Beach, Fla., 561 F.3d 1288, 1292 (11th Cir. 2009) (finding qualified immunity insulated the officer because "Lewis did not remain compliantly restrained" and continued to struggle with the officers), cert. denied, 559 U.S. 936 (2010).

In Vinyard, 311 F.3d at 1347-48, the arrestee was screaming and using foul language in the patrol car. Admittedly, her crimes were considered minor offenses. Id. at 1347. She posed no threat to the safety of the officers or others. Id. She did not actively resist the initial arrest or attempt to flee. Id. at 1348. Importantly, at the time of the use of force, she was "under arrest and secured with handcuffs and in the back seat of the patrol car." Id. After undertaking its qualified immunity analysis, the Eleventh Circuit concluded the officer's action of stopping the patrol car, grabbing the arrestee and bruising her and spraying her with pepper spray constituted unreasonable and excessive force. Id. at 1349.

Comparably, although Plaintiff had been arrested for more serious offenses, he did not actively resist initial arrest or attempt to flee.[17] As it must, this Court "must look at the

_____

[17] Generally, a Fourth Amendment violation is found for non-violent suspects, accused of minor crimes, who have not resisted arrest. In this case, it is a closer call, because the offenses cannot be deemed minor and Plaintiff displayed a weapon when he approached the FBI grounds. But, Plaintiff did not resist the initial arrest. He was in custody and restrained when the police officers arrived. The officers placed Plaintiff in handcuffs behind his back and put him in a police car, without incident.

totality of the circumstances[.]" <u>Garrett</u>, 378 F.3d at 1280. This Court recognizes that the officers' actions should not be judged "with the 20/20 vision of hindsight[,]" and the Court must make an allowance for the fact that police officers are often called to make split-second decisions in highly volatile situations, <u>Calhoun v. Thomas</u>, 360 F.Supp.2d at 1275 (quoting <u>Graham</u>, 490 U.S. at 396), but pursuant to Plaintiff's rendition of the facts, he actually desired to be taken into some sort of custody for protection due to his belief, although based upon delusional thought, that he was being followed and someone was trying to kill him. He climbed the gate of the FBI grounds in order to place himself in a protected environment. At the time of the police officers' use of force, Plaintiff had surrendered to the security guard, was under arrest and restrained, with his hands cuffed behind his back and secured in the back seat of a patrol car. Although Plaintiff yelled once to a passer by, he did not threaten the officers or cause disruption in the police car by kicking the seat or making other violent or threatening movements.

Of some concern, Plaintiff states he did disobey the officer's order to present himself to be hogtied in the back seat of the car, admittedly a failure to obey an instruction of an officer. <u>See Williams v. Deal</u>, 659 F. App'x at 599 (finding a violation of Fourth Amendment rights due to an officer's unprovoked use of force against a non-hostile, non-violent suspect who has not disobeyed instructions) (citing <u>Fils v. City of Aventura</u>, 647 F.3d 1272,

1289-90 (11th Cir. 2011)).  However, according to Plaintiff, this directive was a precursor to the actual use of force, and was part and parcel of the uncalled for or unjustified use of force as he was compliant and already secured in the back seat of the police car.  Indeed, qualified immunity is not available to police officers who subject an arrestee to significant force when the arrestee "would be considered by any reasonable police officer to be fully secured" and the force used is "wholly unnecessary to any legitimate law enforcement purpose[.]"  Galvez, 552 F.3d at 1245 (citing and quoting Lee v. Ferraro, 284 F.3d at 1199 (relying on Lee and Slicker v. Jackson, 215 F.3d 1225, 1233 (11th Cir. 2000)).

Also of note, Plaintiff states that after he was assaulted, hogtied and placed in the back seat of the police car, Defendant Garriott proceeded to give him a rough ride to the PTDF, without securing Plaintiff in the back seat with a seat belt, a ride so rough he was thrown around the back of the car in a hogtied position, without the ability to brace himself.  He states he bled all over the back of the police car.  When Plaintiff asked Officer Garriott if he was being taken to the hospital, he responded in the negative.

The Court concludes the conduct of Officers Garriott and Votava rises to the level of a Fourth Amendment violation.  At the time of the use of force, Plaintiff was already securely handcuffed behind his back and seated in the back seat of the police car.  He was no threat to the officers, to himself, or to the safety of

others.  Accepting the facts in the light most favorable to
Plaintiff, at the time of the use of force, he was not resisting
arrest or attempting to escape.  He sat passively in the police
car, and the use of force was unprovoked.  If the events in fact
occurred, the use of force was unjustified and "[t]here is nothing
even perceptibly reasonable about such behavior[.]"  Calhoun, 360
F.Supp.2d at 1276.

Plaintiff claims the Sergeant at the scene, Defendant Morgan,
failed to intervene.  As this Court previously explained:

> An officer has a duty to intervene to stop the
> use of excessive force if: (1) he is in a
> position to do so and (2) refuses to do so.
> Priester v. City of Riviera Beach, Fla., 208
> F.3d 919, 924-25 (11th Cir. 2000). The
> Eleventh Circuit does not recognize a duty to
> intervene in constitutional violations which
> occur outside of the excessive force context.
> Jones v. Cannon, 174 F.3d 1271, 1286 (11th
> Cir.1999). However, "if a police officer,
> whether supervisory or not, fails or refuses
> to intervene when a constitutional violation
> such as an unprovoked beating takes place in
> his presence, the officer is directly liable."
> Ensley v. Soper, 142 F.3d 1402, 1407-08 (11th
> Cir.1998).

Montanez v. Celaya, 49 F.Supp.3d 1010, 1019-20 (M.D. Fla. 2014).

If the evidence of Plaintiff is to be believed, Morgan was
present and in a position to intervene as he was able to observe
his fellow officers use force.  Cf. Militello v. Sheriff of Broward
Sheriff's Office, 684 F. App'x 809, 815 (11th Cir. 2017) (finding
deputies were not physically present where the alleged excessive
force took place); Riley v. Newton, 94 F.3d 632, 635 (11th Cir.

1996) (finding the officer did not fail to intervene because he was engaged in other duties on the other side of the vehicle, he did not observe the use-of-force, and he had no reason to expect the use-of-force), cert. denied, 519 U.S. 1114 (1997).

Reviewing the facts in the best light for Plaintiff, Defendant Morgan provided the hobble to Officer Garriott. At the time of the use of force, Defendant Morgan was in his car, in close enough proximity to see Officer Votava and Plaintiff go to ground as Plaintiff hit the concrete next to Sergeant Morgan's car. Sergeant Morgan stepped out of his car and was a couple of feet away from the struggle. He stood by and watched the incident, including the hobbling of Plaintiff. There is nothing in the record suggesting Sergeant Morgan had an inability to intervene. See Grimes v. Yoos, 298 F. App'x 916, 921 (11th Cir. 2008) (per curiam) (a police officer with the ability to intervene must protect the arrestee and stop another police officer from using excessive force) (citing Priester, 208 F.3d at 924-25). Taking the facts in the best light for the Plaintiff, Defendant Morgan had a "real opportunity" to intervene in the alleged unlawful conduct. See Keating v. City of Miami, 598 F.3d 753, 764 (11th Cir. 2010) (citation omitted).

The Court finds the conduct of Sergeant Morgan rises to the level of a Fourth Amendment violation. He had a real opportunity to intervene, the ability to intervene, and was in a position to actually intervene, but failed to do so. Under Plaintiff's version of the facts, a jury could find that Defendant Morgan violated

Plaintiff's constitutional rights to be protected from excessive force through intervention.

Where qualified immunity has been pled, a district court must inquire as to whether a reasonable officer would have known that his conduct is unconstitutional under the Fourth Amendment at the time of the incident. Stephens, 852 F.3d at 1315. The first method of inquiry requires the district court to consider "the relevant case law at the time of the violation; the right is clearly established if a concrete factual context exists so as to make it obvious to a reasonable government actor that his actions violate federal law." Id. (citation omitted). The second method of inquiry does not look at the case law, but instead looks at the officer's conduct, and asks whether it "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the officer[.]" Id. (citation omitted).

Therefore, with regard to Defendants Garriott, Votava, and Morgan, this Court asks, whether, at the time of the events in the case, the state of the law was such that it would have been clear to the officers that their actions violated Plaintiff's rights. Notably, "[t]here is substantial case authority in the Supreme Court and this Circuit clearly establishing that harming a suspect after that suspect is compliant, cooperative, under control, or otherwise subdued is gratuitous and, therefore, constitutionally excessive." Merricks v. Adkisson, 785 F.3d 553, 563 (11th Cir.

2015) (looking to what force was applied and when it was applied, and recognizing that qualified immunity will likely not apply if "gratuitous force was applied after the suspect was subdued or otherwise cooperating").

The answer in this case is yes, the state of the law was such on the date of the excessive conduct to give the officers fair warning that their actions were unconstitutional because the arrest had been fully effected, Plaintiff was completely secured in the back seat of the police car, and any danger he presented on the grounds of the FBI facility vitiated at the time of the use of force. As such, case law put the Defendants on notice that their actions were unlawful. <u>Galvez</u>; <u>Lee</u>; <u>Slicker</u>; <u>Preister</u>; <u>Keating</u>. Therefore, qualified immunity is unavailable to these Defendants as the clearly established law placed the Defendants on notice that their actions were unlawful. Under the first method of inquiry, Defendants Garriott and Votava, as a matter of law, violated Plaintiff's right to be free from excessive force, and Defendant Morgan, as a matter of law, violated Plaintiff's right to be protected from the excessive force.

Out of an abundance of caution, the Court will employ the second inquiry, in the alternative, and finds, given the circumstances presented, in the light most favorable to the Plaintiff, Defendants actions were so far beyond the hazy border between excessive and acceptable force that every objectively reasonable officer, in these circumstances, would have known he was

violating the Constitution, even without any particularized case law on point.  In this regard, no objectively reasonable police officer could believe that after Plaintiff was placed under arrest, handcuffed behind his back, placed in the back seat of a patrol car, the officer(s) could yank the arrestee out of the patrol car, causing the arrestee to hit his head on the concrete and suffer a concussion, apply such force as to cause abrasions and significant swelling to the arrestee's face, and then hogtie the arrestee, injuring his back and shoulder and cause bleeding and scarring to the arrestee's wrists, and then put the arrestee back into the back seat of the police car, hogtied, without a seat belt or other restraints, to be thrown around the back of the police car as it proceeded to the PTDF, where Plaintiff was left on the sidewalk for over an hour, hogtied, and without being provided any medical attention.  See Vinyard, 311 F.3d at 1355.  "[N]o particularized preexisting case law" is necessary under these circumstances to overcome the defense of qualified immunity.  Priester, 208 F.3d at 927.  The same is true regarding the claim of failure to intervene raised against Defendant Morgan.  This case is one of obvious clarity, and Defendant Morgan is not entitled to qualified immunity.

### B.  Medical Care

Defendants raise the affirmative defense of qualified immunity with respect to Plaintiff's claims of deliberate indifference to his serious medical and mental health needs.  Defendants, for

purposes of the Motion, accept Plaintiff's version of the events as true. Motion at 2 n.1. With regard to the issue of deprivation of medical care, "delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay." Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1189 (11th Cir. 1994), abrogated on other grounds by Hope v. Pelzer, 536 U.S. 730 (2002). "Delayed treatment for injuries that are of a lesser degree of immediacy than broken bones and bleeding cuts, but that are obvious serious medical needs, may also give rise to constitutional claims." Harris v. Coweta County, 21 F.3d 388, 394 (11th Cir. 1994).

Initially, the Court finds Defendants Garriott and Votava were acting within their discretionary powers when they arrested Plaintiff and transported him to the PTDF. The Court asks whether, under Plaintiff's version of the facts, a constitutional violation occurred with respect to Plaintiff's claim that Defendants Garriott and Votava were deliberately indifferent to Plaintiff's serious medical needs.

Taking Plaintiff's version of the events as true, after he struck his head on the concrete and after Officer Votava climbed on top of him and Officer Garriott hogtied him, Plaintiff had visible injuries to his face. During transport, Plaintiff asked Defendant Garriott if he was being taken to the hospital. Plaintiff bled from his face all over the back seat of the police car. Once he

arrived at the PTDF, Plaintiff remained hogtied, lying on the sidewalk, without medical attention, for over an hour. Defendants Garriott and Votava were advised that the PTDF would not admit Plaintiff until reports were completed. Once the handcuffs were removed, there was active bleeding from Plaintiff's wrists. Plaintiff's booking photo showed significant swelling to the left side of his face and an abrasion to the right side of his face. He also had an abrasion to his shoulder, discovered afterwards. Defendant Okafor cleaned the blood off of his face and wrists when she saw him in the PTDF.

To summarize, Plaintiff had visible injuries after force was used during the arrest.[18] Defendants Garriott and Votava did not opt to take Plaintiff to the hospital. Upon arrival at the PTDF, Defendants Garriott and Votava were told Plaintiff would not be allowed to enter the facility until reports were completed. Defendant Garriott worked on the report, and Defendant Votava watched Plaintiff. Plaintiff did not see a licensed practical nurse until after he had lain on the sidewalk of the PTDF, hogtied,

---

[18] Defendants Garriott and Votava were admonished for violating the General Order concerning Response to Resistance, requiring a RTR Report and/or an RTR Witness Report "[u]pon observation of an injury pursuant to a Response to Resistance incident." (Doc. 75-7 at pp. 181-82). The Internal Affairs investigation related: "Garriott and Votava had no reasonable explanation as to why they did not see the injury which was clearly visible to the medical staff and documented thirty-eight (38) minutes after McKnight was accepted into the PDF. Additionally, those same injuries were further documented in photographs taken eight (8) to fifteen (15) minutes after the encounter written by LPN Okafor." Id. at 181.

for over an hour.  Both Defendants were aware of this delay to admission to the PTDF.

To defeat qualified immunity with respect to Defendants Garriott and Votava, Plaintiff must show both that a constitutional violation occurred and that the constitutional right violated was clearly established.  <u>Fennell v. Gilstrap</u>, 559 F.3d at 1216.  Since these Defendants were acting within the scope of their discretionary authority when the alleged failure to seek or provide medical attention occurred, the burden is on Plaintiff to show the Defendants are not entitled to qualified immunity.  <u>Skop v. City of Atlanta</u>, 485 F.3d 1130, 1136-37 (11th Cir. 2007).

"A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'  In the alternative, a serious medical need is determined by whether a delay in treating the need worsens the condition."  <u>Mann v. Taser Int'l, Inc.</u>, 588 F.3d 1291, 1307 (11th Cir. 2009) (quoting <u>Hill</u>, 40 F.3d at 1187).

To demonstrate deliberate indifference to serious medical needs, a plaintiff must satisfy both an objective and a subjective inquiry.  <u>See</u> <u>Brown v. Johnson</u>, 387 F.3d 1344, 1351 (11th Cir. 2004) (citation omitted).  First, he must satisfy the objective component by showing that he had a serious medical need, <u>Goebert</u>, 510 F.3d at 1326, thereafter, he must satisfy the subjective component, requiring the plaintiff to adequately present an

allegation "that the prison official, at a minimum, acted with a state of mind that constituted deliberate indifference." <u>Richardson v. Johnson</u>, 598 F.3d 734, 737 (11th Cir. 2010) (per curiam).

Defendants Garriott and Votava are not medical professionals. Therefore, this Court must ask whether Plaintiff's injuries were objectively obvious to a layperson. <u>Lelieve</u>, 846 F.Supp.2d at 1303. Taking the facts in the light most favorable to Plaintiff, this Court asks whether Plaintiff's injuries would have been obvious to another officer in the Defendants' shoes. <u>Id</u>.

The evidence submitted, taken in the light most favorable to Plaintiff, demonstrates he was actively bleeding from his face and wrists, his face was visibly swollen, and he exhibited a significant abrasion to his face. The medical personnel at the PTDF examined Plaintiff and admitted him to the facility, without sending him to the hospital.

Looking through the prism of qualified immunity, as this Court must, any injuries to Plaintiff's back, shoulders, and possible brain injury (concussion) would not have been readily observable by the officers.[19] When Plaintiff was seen by Nurse Okafor at the PTDF, she wiped away blood and dirt, cleaned wounds and applied Neosporin, placed a bandage on his finger, and gave him an ice pack. Defendant Peterson saw Plaintiff that same day and referred

---

[19] Perhaps Plaintiff had a mild concussion, <u>see</u> Declaration of Dr. Bruce A. Hartwig, M.D. (Doc. 87-1 at 1-2), opining that Plaintiff may have sustained a mild concussion during his arrest, with some mild, post-concussion symptoms.

Plaintiff to wound care.  Plaintiff's wounds healed without sutures or surgical intervention.

The Court concludes Plaintiff has failed to demonstrate an objectively serious medical need either at the time of the arrest or by virtue of the delay between arrest and receiving medical attention at the PTDF.  The medical staff of the PTDF did not send Plaintiff to the hospital.  Thus, Plaintiff's injuries were considered minor enough, by medical staff, to release him directly to the institution for confinement.  Consequently, an officer, in Garriott's and Votava's shoes, would not have recognized a serious medical need, requiring immediate medical attention and a trip to the hospital or the calling of emergency medical professionals to the scene.

The Eleventh Circuit explained that in either situation, whether looking at a serious medical need being one so obvious that a lay person would recognize the need for medical treatment, or a serious medical need being determined by whether a delay in treating the need worsens the condition,

> "the medical need must be 'one that, if left unattended, pos[es] a substantial risk of serious harm.'" Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003) (quoting Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000)). We have explained that a successful constitutional claim for "immediate or emergency medical attention" requires "medical needs that are obvious even to a layperson because they involve life-threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem.  In contrast, delay or even

> denial of medical treatment for superficial, nonserious physical conditions does not constitute" a constitutional violation. <u>Hill v. Dekalb Reg'l Youth Det. Ctr.</u>, 40 F.3d 1176, 1187–88 (11th Cir. 1994), <u>abrogated</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>Hope v. Pelzer</u>, 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). An arrestee "who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." <u>Id</u>. at 1188; <u>see</u> <u>also</u> <u>Surber v. Dixie County Jail</u>, 206 Fed. Appx. 931 (11th Cir. 2006) (unpublished opinion).

<u>Fernandez v. Metro Dade Police Dept.</u>, 397 F. App'x 507, 511–12 (11th Cir. 2010).

Even construing the facts in the light most favorable to Plaintiff, Plaintiff's injuries did not involve life-threatening conditions or a situation where the delay in seeing medical staff at the PTDF detrimentally exacerbated Plaintiff's medical condition. The booking photographs confirm Plaintiff did not receive stitches to his face or appear to need stitches. Defendant Okafor provided Plaintiff with an ice pack. The CNA referred Plaintiff to wound care, but did not refer him to the hospital or elsewhere for sutures or x-rays. After professional medical assessment of Plaintiff's condition, the medical staff determined Plaintiff needed no other medical procedures at the time of admission to the PTDF.

Likewise, the evidence does not establish that Defendants Garriott and Votava had subjective knowledge of a risk of serious harm if Plaintiff was not immediately transported to a hospital or

provided with other emergency medical care, either at the scene or upon arrival at the PTDF. Although Plaintiff states his face bled, and it also bled in the patrol car, he has not demonstrated that Defendants Garriott and Votava were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and actually drew that inference by conduct that is more than mere negligence.

Moreover, to the extent Plaintiff is claiming Defendants Garriott and Votava's delay in seeking treatment for Plaintiff constituted deliberate indifference, Plaintiff has not provided "verifying medical evidence" to establish the detrimental effect of the delay in medical treatment. <u>Flanning v. Fla. Dep't of Corr.</u>, No. 5:12cv337-MW/CJK, 2014 WL 4438610, at *6 (N.D. Fla. Sept. 5, 2014) (quoting <u>Hill</u>, 40 F.3d at 1188). Although "it is 'clearly established that an official acts with deliberate indifference when he intentionally delays providing access to medical treatment, knowing that the [detainee] has a life-threatening condition or an urgent medical condition that would be exacerbated by delay[,]'" this record does not reveal that Plaintiff was suffering from a life-threatening condition or had any urgent medical condition which was unduly exacerbated by the delay in obtaining medical attention. <u>Johnson v. Bessemer, Ala. City of</u>, No. 17-13122, 2018 WL 3359672, at *6 (11th Cir. July 10, 2018) (per curiam) (quoting <u>Valderrama v. Rousseau</u>, 780 F.3d 1108, 1121 (11th Cir. 2015)).

In this case, the evidence taken in the light most favorable to Plaintiff shows he did not have a serious medical need at the time of his arrest and Defendants Garriott and Votava were not deliberately indifferent to any such need. The Court concludes Defendants Garriott and Votava did not commit a constitutional violation of deliberate indifference to serious medical needs. Therefore, Defendants Garriott and Votava are entitled to qualified immunity with respect to this claim of a constitutional deprivation.[20]

The question remains whether Defendants Garriott, Votava, and Morgan were deliberately indifferent to Plaintiff's serious mental health needs. The right to receive medical treatment for illness and injuries includes the right to psychiatric and mental health care. Belcher, 30 F.3d at 1396. Defendants Garriott, Votava, and Morgan assert a claim of qualified immunity.

The record shows Defendants Garriott, Votava, and Morgan all observed Plaintiff's bizarre behavior and believed him to be suffering from some type of mental illness. "The Officers have never disputed that Plaintiff was suffering from a mental health condition the night of his arrest." Reply at 4. Plaintiff

---

[20] The Court need not address whether the law was clearly established at the time of the incident. "The qualified immunity inquiry can begin with either step, neither is antecedent to the other." Keith v. DeKalb Cty., Ga., 749 F.3d 1034, 1048 (11th Cir. 2014) (citation omitted). Once one prong is found unsatisfied, the Court need not address the remaining prong because a plaintiff must satisfy both showings to survive a qualified immunity defense.

appeared to be paranoid and schizophrenic, going through a psychotic break or mental crisis. He did not, however, express suicidal ideation or homicidal thoughts. Instead, he expressed fear that someone was trying to kill him.

Plaintiff, in his Complaint, alleges that these Defendants knew Plaintiff was suffering from a mental illness, and they knew they were required to provide medical care or seek medical assistance for Plaintiff. Complaint at 20. Plaintiff avers that Defendants Garriott, Votava, and Morgan's failure to address Plaintiff's obvious mental health episode, presented a substantial risk of serious harm to Plaintiff. Id. Finally, Plaintiff claims he suffered unnecessary and wanton infliction of pain and suffering due to the Defendants' failure to address Plaintiff's serious mental health needs. Id.

In undertaking its review, the Court recognizes that these Defendants "are police officers whose primary responsibility is to enforce laws and to arrest persons suspected of violating laws in their community." Belcher, 30 F.3d at 1400. They are not health care providers, but they are required to see that a detainee receives medical attention if the detainee exhibits serous medical needs.

It is quite apparent that:

> "[f]ailure to provide basic psychiatric and mental health care states a claim of deliberate indifference to the serious medical needs of prisoners." Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir. 1986). "The case law

> establishes that 'mental health needs are no
> less serious than physical needs' for purposes
> of the Eighth Amendment." <u>Thomas v. Bryant</u>,
> 614 F.3d 1288, 1312 (11th Cir. 2010) (quoting
> <u>Gates v. Cook</u>, 376 F.3d 323, 332 (5th Cir.
> 2004)). This is because the denial of adequate
> mental-health care can be just as painful as
> the denial of adequate physical health care.
> <u>See</u> <u>Ind. Prot. & Advocacy Servs. Comm'n v.</u>
> <u>Comm'r, Ind. Dep't of Corr.</u>, 2012 WL 6738517,
> at *21 (S.D. Ind. Dec. 31, 2012) (Pratt, J.)
> ("Psychological pain exists. It is real and it
> results from many of the symptoms which are
> associated with the mentally ill.").

<u>Dunn v. Dunn</u>, 219 F.Supp.3d 1100, 1121–22 (M.D. Ala. 2016).

Deliberate indifference claims have both an objective and a subjective component. Initially, the Court focuses its inquiry on whether Plaintiff had a serious mental-health care need. Here, Plaintiff's need was "so obvious that even a lay person would easily recognize the necessity for doctor's attention." <u>Id</u>. at 1130 (quoting <u>Jacoby v. Baldwin Cty.</u>, 596 F. App'x 757, 763 (11th Cir. 2014) (per curiam)). The officers at the scene recognized Plaintiff was having a psychotic episode or mental break down of some type. As Officer Garriott described it: "I would believe he probably is schizophrenic because he was very very paranoid and believed without a doubt people were following him, putting transmitters in his brain; people are trying to take him out, but never explained what, who, or why." (Doc. 75-3 at 23).

At the scene, Plaintiff expressed delusions and paranoid ideation. He undertook extreme measures to seek protection from unidentified persons he thought were trying to kill him, by jumping

over the fence of the FBI grounds with a gun in his hand.[21]  Taking

the facts in the light most favorable to Plaintiff, Plaintiff's

psychiatric condition constituted a serious medical need.  <u>Harris

v. Thigpen</u>, 941 F.2d 1495, 1505 (11th Cir. 1991) (acknowledging the

deliberate indifference standard extends to psychiatric and mental

health needs).  Plaintiff has satisfied the objective component of

the test.

In the mental health context, addressing a claim of deliberate

indifference to the taking of one's own life, the Eleventh Circuit

opined:

> To establish a defendant's deliberate
> indifference, a plaintiff must show "(1)
> subjective knowledge of a risk of serious
> harm; (2) disregard of that risk; (3) by
> conduct that is more than mere negligence."
> Jackson, 787 F.3d at 1353 (quoting <u>McElligott
> v. Foley</u>, 182 F.3d 1248, 1255 (11th Cir.
> 1999)).  "[D]eliberate indifference requires
> that the defendant deliberately disregard 'a
> strong likelihood rather than a mere
> possibility that the self-infliction of harm
> will occur. The mere opportunity for suicide,
> without more, is clearly insufficient to
> impose liability on those charged with the
> care of prisoners.'" <u>Snow v. City of
> Citronelle, Ala.</u>, 420 F.3d 1262, 1268-69 (11th
> Cir. 2005) (quoting <u>Cook ex rel. Estate of
> Tessier v. Sheriff of Monroe County, Fla.</u>, 402
> F.3d 1092, 1115 (11th Cir. 2005)). "A prison
> custodian is not the guarantor of a prisoner's
> safety." <u>Cagle v. Sutherland</u>, 334 F.3d 980,
> 989 (11th Cir. 2003) (quoting <u>Popham</u>, 908 F.2d
> at 1564).

---

[21] Ultimately, Plaintiff was found not guilty of the charged
felony offenses by reason of insanity.  He has been diagnosed with
schizophrenia and depression and has experienced auditory and
visual delusions.

> "[A]n official's failure to alleviate a
> significant risk that he should have perceived
> but did not, while no cause for commendation,
> cannot under our cases be condemned as the
> infliction of punishment." <u>Farmer v. Brennan</u>,
> 511 U.S. 825, 838, 114 S.Ct. 1970, 128 L.Ed.2d
> 811 (1994) (rejecting assertion that "a prison
> official who was unaware of a substantial risk
> of harm to an inmate may nevertheless be held
> liable under the Eighth Amendment if the risk
> was obvious and a reasonable prison official
> would have noticed it."); <u>Snow</u>, 420 F.3d at
> 1270 (denying qualified immunity to jail
> officer, who was subjectively aware of the
> substantial risk of harm, and deliberately
> chose not to communicate that risk to others
> after his shift concluded or attempt to remedy
> the risk in any way).

<u>Salter for Est. of Salter v. Mitchell</u>, 711 F. App'x 530, 537 (11th Cir. 2017).

Under the subjective component, Plaintiff is obliged to show subjective knowledge of a risk of serious harm, disregard of that risk, by conduct that is more than mere negligence. The Court is not convinced that Plaintiff has succeeded in showing Defendants Garriott, Votava, and Morgan had subjective knowledge of a risk of serious harm, nor has Plaintiff shown the officers disregarded that risk through conduct that is more than mere negligence. Again, Plaintiff did not threaten to commit suicide and he did not express homicidal thoughts. Instead, he sought protection, leaping over the guard gate at the FBI facility. Thereafter, the officers took him into their custody and placed him in a police car.

Upon review, the Arrest and Booking Report, written by Officer Garriott, states that Plaintiff said "an unknown person was

following him and trying to kill him so he wanted the FBI to help him." Complaint, Exhibit B (Doc. 72-2 at 4). The report also mentions the officers applied a TAR to Plaintiff's feet as he was kicking the officers. Id. at 5. Curiously, under "Jail Information", "Date and Time Admitted: 7/31/2014 23:41", "Triage Questions", the following questions were answered in the negative: "Was a hobble restraint used on the arrestee?"; "Does the arrestee have any observable medical/mental health problems?" and "Has the arrestee shown any escape potential or violence propensity behaviors?" Id. at 6. Although Defendant Garriott, or another officer, failed to respond affirmatively to these questions, Garriott included relevant information in his report that a TAR had been applied to Plaintiff and Plaintiff thought an unknown person was trying to kill him so he went to the FBI office seeking help.

The Court is mindful that mere incidents of negligence do not rise to the level of a constitutional violation. These officers primary responsibility was to enforce the law and to arrest Plaintiff. The officers could reasonably have assumed that the medical staff at the PTDF would provide Plaintiff with any necessary treatment, and the medical staff would undertake the appropriate review of both Plaintiff's physical and mental

condition.[22]  Any failure by Garriott to include additional information in the report amounts to mere negligence.

The officers had probable cause to arrest Plaintiff.  At the scene of the arrest, Plaintiff was not expressing suicidal or homicidal ideation.  He exhibited paranoid behavior, and expressed fear of others.  Under these circumstances, the decision to arrest Plaintiff and take him to jail, rather than taking him to the hospital for treatment or calling medical professionals for a mental health assessment at the scene, did not violate Plaintiff's clearly established rights.  See Vila v. Miami-Dade Cty., 65 F.Supp.3d 1371, 1381 (S.D. Fla. Nov. 25, 2014) (finding no violation of an established constitutional right for failure to take an arrestee to jail rather than to a hospital for mental health treatment).  Plaintiff has not demonstrated that "every reasonable government official in a similar position would have known that defendants' acts were unlawful."  Id. (quoting Rodgers

---

[22] The record reflects that this was not the first time Plaintiff had been confined at the PTDF.  Dr. Hall noted that the medical records from the PTDF, dated July 9, 2014, recorded shortly before the incident at bar, stated Plaintiff was in Mental Health Lock Down for reportedly hallucinating, responding to voices, and talking to himself.  (Doc. 75-7 at 68).  Plaintiff reported he thought he was in the hospital and he did not know the date.  Medical staff noted current suicidal ideation.  Id.  An additional notation referenced Plaintiff going in and out of a delusional state on July 10, 2014.  Id. at 38.  Presumably, these medical records, kept by the PTDF, were readily available for review by the medical staff, just as they were readily obtainable for Dr. Hall's review.

v. Horsley, 39 F.3d 308, 310 (11th Cir. 1994) (per curiam)).
Moreover,

> Plaintiff has not cited, and the Court cannot
> find, any precedent holding that the
> Constitution requires an arresting officer to
> determine whether a mentally ill arrestee's
> psychiatric condition is so severe as to
> require immediate medical attention, and that
> the officer violates the arrestee's
> constitutional rights by subsequently
> transporting the arrestee to jail, rather than
> a psychiatric facility.

Id. at 1383.

As such, Defendants Garriott, Votava, and Morgan are entitled to qualified immunity with respect to the claim of deliberate indifference to serious mental health needs. These were arresting officers, carrying out their duties to arrest and transport Plaintiff to the PTDF, where he would be seen by medical staff and either admitted to the jail or sent to the hospital. In this instance, the medical staff admitted Plaintiff to the jail after medical screening. Since the law was not clearly established at the time of the arrest, Plaintiff's claim of deliberate indifference against these officers does not survive the qualified immunity defense.

Plaintiff's final claim, the claim that Defendant Diaz,[23] Defendant Okafor, and Defendant Peterson were deliberately indifferent to Plaintiff's serious medical needs once Plaintiff was

---

[23] Of note, Plaintiff names Defendant Diaz in his individual and official capacities.

confined at the PTDF, remains to be addressed. The Court concludes Defendants Diaz, Okafor, and Peterson were acting within their discretionary powers when they treated or reviewed the treatment of Plaintiff at the PTDF. A qualified immunity defense inquiry requires this Court to ask whether, under the best version of the Plaintiff's facts, a constitutional violation occurred with respect to Plaintiff's claim of deliberate indifference to his serious medical needs at the PTDF against Defendants Diaz, Okafor, and Peterson.

The Court recognizes that Plaintiff's medical needs at the PTDF were not identical to his needs immediately after the arrest. Although Plaintiff's face was swollen at the time of booking, eventually Plaintiff's eye swelled shut, and the pain intensified.

In his Complaint, Plaintiff alleges Defendant Okafor, on August 1, 2014, ignored Plaintiff's complaints and requests for sutures and x-rays and failed to examine him.[24] Plaintiff attested the blood had dried up by the time he was seen by Defendant Okafor, except he was actively bleeding from his wrists, as the handcuffs had recently been removed. (Doc. 75-1 at 317-18). Plaintiff contends Defendant Okafor should have sent him to the hospital due to active bleeding, and for sutures and x-rays. He asserts she

---

[24] The record demonstrates Plaintiff's injuries healed without sutures, medical staff sent Plaintiff to wound care, and medical staff provided Plaintiff with pain medication and ointments, including an antibiotic ointment for his injuries.

failed to provide him any pain medication or other treatment and failed to document his injuries.

The record shows Defendant Nurse Okafor took Plaintiff's vital signs, cleaned Plaintiff's wounds, applied Neosporin to the wounds, and provided a bandage for Plaintiff's finger. (Doc. 75-8 at 6). Defendant Okafor also provided Plaintiff with an ice pack for his swollen face.[25]  Id.  She found no active bleeding.  Id.

Defendant Peterson's medical assessment followed at 1:42 a.m. Plaintiff contends Defendant Peterson should have sent him to the hospital due to his injuries.  Defendant Peterson, a Certified Nursing Assistant, noted open skin sores and a laceration to Plaintiff's right middle finger, she found a wound to be significant with swelling, and she referred Plaintiff to wound care. (Doc. 72-5 at 2-5).  Defendant Peterson recorded that the patient told her he had been involved in a physical altercation during his arrest.  Id. at 2.  Defendant Peterson took Plaintiff's

_____

[25] Nurse Okafor's assessment took place at 12:19 a.m. on August 1, 2014.  She wrote:

> Here at ITR pt with swollens [sic] on his left jaw stating, cut on his right hand middle finger, all wounds cleaned with NS bandaids applied to his right hand middle finger, ice pack offered for pt to apply on his jaw, pt tolorating [sic] denies any loose tooth, no active bleeding noted, pt was alert and orientated x 4, speaking in complete and clear sentence, gait steady in no distress, will continue with intake process. Vs was T 97.5, O2 97, P 101, R 16, BP 130/70.

(Doc 75-8 at 6).

vital signs, finding them within normal limits.  <u>Id</u>. at 4.
Defendant Peterson did not observe Plaintiff to be disoriented to
person, place or time, or to be expressing any incoherent
statements.  <u>Id</u>.  Defendant Peterson recommended Plaintiff's
placement in general population and educated him about sick call
and walk-in services.[26]  <u>Id</u>. at 5.

In order to defeat the defense of qualified immunity,
Plaintiff has to show both a constitutional violation occurred and
the constitutional right violated was clearly established.  The
Court finds Defendants Okafor and Peterson were acting within the
scope of their discretionary authority when the alleged deliberate
indifference to a serious medical need occurred.  At this juncture,
the burden is on Plaintiff to show Defendants Okafor and Peterson
are not entitled to qualified immunity.

A plaintiff must demonstrate that a defendant's responses to
his medical needs were poor enough to constitute an unnecessary and
wanton infliction of pain, and not merely accidental inadequacy,
negligence in treatment, or even medical malpractice actionable
under state law.  <u>Taylor v. Adams</u>, 221 F.3d 1254, 1258 (11th Cir.
2000) (citing <u>Estelle v. Gamble</u>, 429 U.S. 97, 105-106 (1976)),
<u>cert</u>. <u>denied</u>, 531 U.S. 1077 (2001).  As such, Plaintiff must have

---

[26] Later that same day, Plaintiff completed a Non-Emergency
Health Services Request form, complaining of pain to his face,
hands, and back, and labeling the pain the worst pain of his life
on a scale of 1 to 10, with 10 being the worst pain.  (Doc. 72-6 at
2).

had an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from the facts presented. Taylor v. Adams, 221 F.3d at 1258.

The Court is not convinced Plaintiff has established an objectively serious medical need at the time of his admission to the PTDF. Plaintiff had abrasions, wounds, and swelling, and, according to Plaintiff, active bleeding of his wrists due to the removal of his handcuffs, but these wounds and abrasions and resultant swelling were treated through cleansing, ointment, bandages, and an ice pack. Even assuming Plaintiff had a serious medical need, Defendant Okafor and Defendant Peterson addressed Plaintiff's needs and determined they did not constitute a medical emergency, with Defendant Okafor finding Plaintiff could be admitted to the jail and Defendant Peterson finding Plaintiff could be housed in general population with wound care to follow.

Furthermore, Plaintiff has not demonstrated an objectively insufficient response to his medical needs. Two different medical professionals saw Plaintiff that night, and neither of the two considered Plaintiff's complaints or physical condition a medical emergency or responded as if Plaintiff's health was at risk if he did not receive additional medical care rather than accessing routine sick call or walk-in. Finally, Plaintiff has not shown subjective awareness of facts signaling the need and an actual inference of required action from the facts presented. The staff,

after assessing Plaintiff's condition, did not find his condition to present dire or exigent circumstances requiring immediate, additional medical attention or a trip to the hospital for sutures and x-rays.

Taking the evidence in the light most favorable for Plaintiff, he has not shown that Defendant Okafor and Peterson misjudged Plaintiff's medical situation or that a life-threatening or other dire medical condition was exhibited and ignored or exacerbated by the failure to send Plaintiff to the hospital for additional treatment on August 1, 2014. Even assuming Plaintiff had a minor concussion, a mild traumatic brain injury, routinely, the means to manage the symptoms are over-the-counter analgesics and rest, recognizing that the severity of the post-concussive symptoms lessens with the passage of time.[27]  Wilson v. Browne, No. 3:09cv310/RV/CJK, 2011 WL 7068986, at *10 (N.D. Fla. Dec. 23, 2011), report and recommendation adopted by 2012 WL 170880 (N.D. Fla. Jan. 20, 2012). Moreover, in order to show a deprivation of a constitutional dimension based on any delay in medical treatment, the plaintiff "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." Hill, 40 F.3d at 1187-88. See Fernandez, 297 F. App'x at 512 (finding same). Plaintiff has not established any

---

[27] Plaintiff said medical staff told him to purchase over-the-counter medication at the canteen.

detrimental effect of delay in treatment for the injuries he sustained on July 31, 2014.

The record shows Plaintiff filed a Non-Emergency Health Services Request on Friday, August 1, 2014. (Doc. 72-6 at 2). The triage of this non-emergency health services request occurred on Monday, August 4, 2014, by someone other than Defendant Okafor or Defendant Peterson. Id. As alleged by Plaintiff, the only interaction Plaintiff had with Defendants Okafor and Peterson was on August 1, 2014, for medical screening. Defendant Okafor performed wound care and gave Plaintiff an ice pack. Defendant Peterson referred Plaintiff to further wound care but she was unable to provide Plaintiff with an ice pack, as none were available.[28]

Brenda Davies, RN, saw Plaintiff on August 5, 2014. (Doc. 72-7 at 2). Under subjective assessment, Nurse Davies recorded an abrasion to the face and left shoulder. Id. Under objective findings, she recorded an abrasion to the left side of Plaintiff's face, with "scabbing, tender, area of scab that has peeled off is pink underneath, no drainage or s/s infection." Id. She recorded an abrasion to the left shoulder as well. Id. She provided Plaintiff with a tube of antibiotic cream for his face, and "polymem" for the shoulder. Id. She ordered a one-time dose of Tylenol for pain and advised Plaintiff to report to sick call for

---

[28] The fact that there were no ice packs available is at most a negligent response, not deliberate indifference.

further issues.  Id.  She wrote a prescription for Acetaminophen (325 mg.), two tablets (Doc. 72-7 at 4).  Dr. Dana Barnes wrote a prescription for Triple Antibiotic Ointment to be applied daily, for seven days (Doc. 72-7 at 5).

Defendants Okafor and Peterson were engaged in discretionary functions when they assessed Plaintiff's medical condition on August 1, 2014.  They did not violate Plaintiff's constitutional rights and are therefore entitled to qualified immunity.[29]  Since this element has not been demonstrated, the Court need not address whether the constitutional right was clearly established at the time of the alleged wrongful act.  Bryant v. Jones, 575 F.3d 1281, 1295 (11th Cir. 2009), cert. denied, 559 U.S. 940 (2010).

Plaintiff also raises a claim of deliberate indifference to serious medical needs against Defendant Chief Diaz.  To provide context for this claim, the Court reviews the relevant grievances tied to this ground.  On August 14, 2014, Plaintiff filed a grievance with medical services, complaining of problems remembering commonplace things and head pain.  (Doc. 72-9 at 4).  He stated no one logged his injuries, including injuries to his head, jaw (swollen), wrist, shoulder, back and hands, and he asserted he should have been sent to the hospital.  Id.  The

---

[29]  To the extent they failed to find the abrasion to Plaintiff's left shoulder, Plaintiff himself did not realize he had a shoulder abrasion until he took a shower.  Plaintiff received medication for his shoulder on August 5, 2014 from Nurse Davies.

grievance response by "Reynolds" is dated August 20, 2014, after Plaintiff had been seen by Nurse Davies and provided with a medical assessment and medication. The response, a denial of the grievance, reads: "[y]our medical record indicates your clinical condition has been treated already and no medications are needed or no other medications will be prescribed." (Doc. 72-9 at 5). Under additional information, employee Reynolds advised Plaintiff to "submit sick call[.]" Id.

Plaintiff, on September 11, 2014, appealed the denial of his grievance. (Doc. 72-12 at 4-5). In his appeal, Plaintiff provided a lengthy explanation as to how he was injured, and then stated his wounds had been cleaned, he had been provided two pain pills and antibiotic cream, and also been provided with a follow-up assessment. Id. at 5. He complained that he had not been checked for a concussion, his back hurts after being idle, and he had not been provided with skin cream or cocoa butter to prevent permanent scarring. Id. He complained of numbness to his hands, an occasional twitch, and concern for proper healing of his hands. Id. In a September 22, 2014 response, Defendant Diaz answered: "[y]our medical problems have been treated. Other complaints about what may have caused your injuries must be discussed with the officers. Please submit a grievance to them." (Doc. 72-12 at 6).

Plaintiff appealed this decision on October 2, 2014. (Doc. 72-14 at 4-5). He explained that he provided the background to his

injuries only for reference. Id. at 4. Plaintiff referred Defendant Diaz to his booking photographs, and said his injuries should have garnered more attention than triple antibiotic ointment and two aspirin. Id. Plaintiff complimented "wound care" and said they did an excellent job. Id. at 5. He stated the screening staff failed to log his injuries and he has suffered pain and scarring. Id. He complained of numbness and scarring to his hands. Id. He also described frequent headaches and lower back pain. Id. He also stated the large area on his face had darkened and expressed a desire for cocoa butter to treat his complexion. Id.

Defendant Diaz, on October 24, 2014, did not specifically approve or deny the grievance, but he did grant some relief. (Doc. 72-14 at 6). Under the "Detailed answer" section, he wrote: "[a]n appointment with our physician has been scheduled to discuss your concerns." Id. On November 21, 2014, Plaintiff filed a grievance with medical services, noting that Chief Diaz had stated in his grievance response that an appointment had been scheduled to address Plaintiff's concerns, but Plaintiff had yet to receive such an appointment. (Doc. 72-16 at 4).

On December 1, 2014, medical services approved the grievance, stating: "[a]ppt. was requested; @ that time - I apologize. I don't know why you were not scheduled - seen today by Dr. Barnes." Dr. Barnes saw Plaintiff on December 1, 2014. (Doc. 72-17 at 2-3). She wrote: "head injury consistent with concussion and post

concussive syndrome[;] chronic back pain." Id. at 2. She educated Plaintiff on the natural course of post concussion symptoms and recommended relaxation during headaches and episodes of symptoms, and she recommended Plaintiff drink plenty of water, exercise regularly, and avoid salty/packaged foods. Id. Dr. Barnes told Plaintiff to return if the headaches increased in frequency or severity, or for any other acute concerns. Id. Dr. Barnes educated Plaintiff on stretching and back exercises and recommended he walk frequently. Id. Dr. Barnes told Plaintiff to follow up, as needed. Id.

In order to defeat Defendant Diaz's affirmative defense of qualified immunity, Plaintiff has to show both a constitutional violation occurred and the constitutional right violated was clearly established. Upon review, Defendant Diaz was acting within the scope of his discretionary authority when the alleged deliberate indifference to a serious medical need occurred. Thus, Plaintiff must show Defendant Diaz is not entitled to qualified immunity. Plaintiff fails in this regard.

There has been no constitutional violation. Defendant Diaz reasonably construed the thrust of Plaintiff's August 14, 2014 grievance to be a complaint about the officers' actions on the date of Plaintiff's arrest. To the extent Plaintiff was complaining that he had not been medically treated, Defendant Diaz found Plaintiff had been both seen and treated by that time. The medical records confirmed Plaintiff had been seen by a Nurse Davies on

August 5, 2014, and given polymem for his shoulder and pain medication, and prescribed triple antibiotic cream for his face by Dr. Barnes.[30] Defendant Diaz's response did not exhibit deliberate indifference to Plaintiff's medical complaints as Plaintiff had been seen by a medical staff, provided with care and medication, and was undergoing wound care.

When Plaintiff appealed the denial of relief, he apprised Defendant Diaz that he was only providing information about the officers as part of his explanation, but he was still seeking medical relief for ongoing ailments. Plaintiff more specifically complained about his ongoing ailments and asked that they be addressed. Defendant Diaz provided Plaintiff with relief, and stated an appointment had been scheduled. When Plaintiff grieved the lack of an appointment, the response by staff noted an appointment had been requested, but apologized for the staff's failure to follow through with Chief Diaz's request. Plaintiff was promptly seen by Dr. Barnes on the date of the staff response.

The record demonstrates Defendant Diaz granted Plaintiff's request for an additional medical assessment and actually put in the request to staff for an appointment. Due to apparent negligent actions of staff, the request was not fully processed, and a doctor's appointment was not scheduled for Plaintiff until he complained of the lack of an appointment. Once the lack of an

---

[30] Dana Barnes, M.D. is the listed prescribing provider for the triple antibiotic ointment (Doc. 72-7 at 5).

appointment was brought to the medical staff's attention, Plaintiff received an immediate appointment with a doctor.

Plaintiff has not shown that Defendant Diaz acted with deliberate indifference to a serious medical need. To the extent the there was a negligent failure to schedule an appointment after Defendant Diaz directed that one be scheduled, this mistake or negligent action alone is not sufficient to bring a constitutional claim of deliberate indifference. <u>See</u> <u>Harris v. Coweta Cty.</u>, 21 F.3d 388, 393 (11th Cir. 1994) (recognizing that "[a]ccidents, mistakes, negligence, and medical malpractice are not 'constitutional violation[s]'") (citation omitted). This type of negligent act or mistake does not transform a state tort into a constitutional violation. Although Plaintiff may still be suffering from pain and the medical staff did not "cure" him, Plaintiff's claim against Defendant Diaz is predicated on mere negligence and does not amount to a constitutional violation.

Plaintiff has not presented sufficient evidence against Defendant Diaz to sustain his claim of deliberate indifference to a serious medical need. Indeed, Plaintiff has not met his burden to show that a constitutional violation occurred to defeat Defendant Diaz's motion for summary judgment based on the defense of qualified immunity. In sum, a reasonable jury could not find that Defendant Diaz violated Plaintiff's constitutional rights; therefore, Defendant Diaz is entitled to qualified immunity.

## VI.  Official Capacity

Finally, Plaintiff names Defendant Diaz in his official capacity. Defendant Diaz submits that Plaintiff "fails to make any allegation regarding a specific policy that was unconstitutional." Motion at 25. Additionally, Defendant Diaz points to Plaintiff's additional failure to present any allegations concerning a wide-spread pattern or practice of failing to provide medical treatment to arrestees. <u>Id</u>. As such, Defendant Diaz argues Plaintiff has been unable to establish municipal liability against Defendant Diaz in his official capacity. <u>Id</u>.

Plaintiff, in his Response, contends Defendant Diaz is a final policymaker and that a single decision made by a municipal official is enough if the decision-maker is the final policymaker for the entity. Response at 20. Plaintiff submits that Defendant Diaz's decision to deny medical care to Plaintiff on September 22, 2014 is enough to create official capacity liability. <u>Id</u>. Defendant Diaz counters this argument by arguing Plaintiff failed to show Defendant Diaz violated Plaintiff's constitutional rights, and even if Plaintiff had established such a violation, Plaintiff failed to adequately show that Defendant Diaz was a final policymaker for the City of Jacksonville. Reply at 7. Plaintiff posits that Defendant Diaz was in a position to be the final policymaker with respect to Plaintiff's medical care, and his decision on September 22, 2014 created liability for the City of Jacksonville.

Upon review of the Complaint, Plaintiff alleges that, in his position as former Chief of the Division of Health Services, Defendant Diaz excised control over, and had a duty to supervise the provision of medical care to inmates, and, as part of this duty, he had a responsibility to coordinate additional medical care outside of the PTDF when the need for specialized medical care arose. Complaint at 4-5. Looking to Defendant Diaz's response of September 22, 2014, he denied Plaintiff's grievance and said: "[y]our medical problems have been treated. Other complaints about what may have caused your injuries must be discussed with the officers. Please submit a grievance to them." (Doc. 72-12 at 6). Defendant Diaz found Plaintiff had been seen and treated. His conclusion that Plaintiff had been treated is supported by the medical records. Nurse Davies saw Plaintiff on August 5, 2014, and both she and Dr. Barnes prescribed medications. The record demonstrates Plaintiff was also undergoing wound care. As noted above, this decision did not subject Plaintiff to a constitutional violation.

Insofar as Plaintiff alleges that his grievance and complaint were mishandled or improperly denied by Defendant Diaz on September 22, 2014, such a claim does not support a § 1983 action. This Court explained in Nicely v. Laqman, 3:12-CV-1300-J-32JBT, 2014 WL 3721266, at *4 (M.D. Fla. July 28, 2014):

> Moreover, this Court agrees that [the defendant] may not be held liable on the theory of respondeat superior or on the basis

that he approved the denial of Plaintiff's formal grievance. <u>See</u> <u>Larson v. Meek</u>, 240 F. App'x 777, 780 (10th Cir. 2007) ("Nothing in either the original complaint or the amended complaint indicates any action or omission by [defendant] beyond his denial of [Plaintiff]'s grievances. [Defendant]'s denial of the grievances alone is insufficient to establish personal participation in the alleged constitutional violations") (citation omitted); <u>Baker v. Rexroad</u>, 159 F. App'x 61, 62 (11th Cir. 2005) (per curiam) ("Because the failure of [the defendants] to take corrective action upon the filing of [the plaintiff]'s administrative appeal at the institutional level did not amount to a violation of due process, the district court properly determined that [the plaintiff] failed to state a claim under § 1983"); <u>Shehee v. Luttrell</u>, 199 F.3d 295, 300 (6th Cir. 1999) (finding that prison officials who were not involved in an inmate's termination from his commissary job, and whose only roles involved the denial of administrative grievances or the failure to act, were not liable under § 1983 on a theory that the failure to act constituted an acquiescence in the unconstitutional conduct).

In order to create the required causal connection between Defendant Diaz's actions or inactions and Plaintiff's claim of deliberate indifference to a serious medical need, Plaintiff must demonstrate that a custom or policy resulted in deliberate indifference to constitutional rights. With regard to the question of policy, Plaintiff must demonstrate a persistent and wide-spread practice. He has failed to make such a showing. <u>See</u> <u>Goebert</u>, 510 F.3d at 1332 (requiring a showing of a persistent and wide-spread practice to demonstrate a policy or custom).

Plaintiff has failed to demonstrate a custom or policy of refusing medical treatment or referrals to outside specialists or hospitals, either based on cost saving measures or based on any other factors, which resulted in deliberate indifference to his serious medical needs. Based on the record, Plaintiff has not shown a persistent and widespread practice of denying medical care at the PTDF. He has not demonstrated that there is a custom or policy of not referring injured arrestees to hospitals due to cost saving measures or other factors. The record shows Plaintiff was treated and he has not demonstrated irreparable injury caused by the decision of Defendant Diaz on September 22, 2014. As such, Defendant Diaz's motion, in his official capacity, is due to be granted.

Even if Plaintiff could satisfy the objective component, Plaintiff "cannot establish the subjective component of his deliberate indifference claim" because there is "no evidence that [the doctor] disregarded [Plaintiff's] severe pain." Ruley v. Corr. Corp. of Am., No. 11-36-ART, 2013 WL 1815039, at *3 (E.D. Ky. Apr. 29, 2013). Upon review of the record, Dr. Diaz's review of Plaintiff's treatment at the PTDF was not so cursory as to constitute deliberate indifference. Indeed, after Plaintiff appealed and requested additional medical care, Dr. Diaz referred Plaintiff to a physician for an additional evaluation. Dr. Barnes and the other health care providers never referred Plaintiff to a hospital. Of note, Dr. Barnes did not prescribe any additional

medication after she prescribed the antibiotic cream on August 5, 2014. Defendant Diaz, in his official capacity, is entitled to qualified immunity.

Accordingly, it is now

**DONE AND ORDERED:**

1.    Defendants Garriott, Votava, and Morgan's Dispositive Motion for Summary Judgment for Count I – Excessive Force (Doc. 75) is **DENIED.**

2.    Defendants' [Garriott; Votava; Morgan; Diaz; Okafor; Peterson; and Diaz, as Chief of the Division of Health Services] Dispositive Motion for Summary Judgment (Doc. 76) is **GRANTED**, and Defendants Alvaro Diaz, Scholastica Okafor, Melissa Peterson, and Alvaro Diaz, as Chief of the Division of Health Services, are dismissed from this action.    Judgment to that effect will be withheld pending adjudication of the action as a whole.    See Fed. R. Civ. P. 54.

3.    Plaintiff's Request for Oral Arguments (Doc. 82) is **DENIED.**

**DONE AND ORDERED** at Jacksonville, Florida, this 16th day of November, 2018.

_____
BRIAN J. DAVIS
United States District Judge

sa 11/6
c:
Counsel of Record